**In re Twana J. GOBLE, Debtor.**

**No. 08–51254.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division at Columbus.

Feb. 17, 2009.

Michael W. Warren, Warren Law Firm, Chillicothe, OH, for Debtor.

## MEMORANDUM OPINION ON MOTION OF THE UNITED STATES TRUSTEE TO DISMISS DEBTOR'S CHAPTER 7 CASE

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

This contested matter is before the Court on the Motion of the United States Trustee to Dismiss Pursuant to 11 U.S.C. §§ 707(b)(2) and/or 707(b)(3) ("Motion") (Doc. 23) and the response to the Motion ("Response") (Doc. 25) filed by the debtor, Twana J. Goble ("Debtor"). The United States Trustee ("UST") asserts two grounds in support of his position that granting the Debtor a Chapter 7 discharge would constitute an abuse of that chapter. First, he contends that the Court must presume that abuse exists under the formulaic means test set forth in 11 U.S.C. § 707(b)(2). Second, he argues that abuse exists under § 707(b)(3)'s more amorphous standard, which requires an examination of "the totality of the circumstances ... of the debtor's financial situation...." 11 U.S.C. § 707(b)(3). In particular, the UST contends that abuse exists because the Debtor could—if the case were converted to Chapter 13—pay creditors a significant dividend out of her projected disposable income calculated as of September 19, 2008, the date of the hearing on the Motion ("Hearing").[1]

The Debtor seeks to remain in Chapter 7 and therefore opposes the Motion. She contends that the deduction of certain housing expenses, which resulted in a reduction of her net income for purposes of the means test, is appropriate even though she will not actually incur those expenses going forward because she surrendered her residential real property ("Former Residence"). In her view, based on these deductions, she does not have sufficient net income under the means test to trigger a presumption of abuse. She also contends that, based on her purported inability to fund a hypothetical Chapter 13 plan as of the date she filed her bankruptcy petition ("Petition Date"), the Court should find no abuse when it considers the totality of the circumstances of her financial situation.

The Motion and the Response thus raise two issues. The first is whether the Debtor, having surrendered the Former Residence, may avoid a presumption of abuse under the means test by deducting from her income the payments she would have been required to make to retain the Former Residence in a Chapter 13 case. The second issue is whether—in the absence of presumed abuse—the Court may nonetheless conclude that abuse exists based in part on the Debtor's actual ability to fund a Chapter 13 plan and, if so, whether the Court should evaluate her funding ability as of the Petition Date, the Hearing or some other date.

For the reasons stated below, the Court concludes that the Debtor may deduct

---

1. During the Hearing, counsel presented argument regarding the Motion and introduced testimony by the Debtor and by a representative of the UST. At the conclusion of the Hearing, the Court provided the parties until October 20, 2008 to file post-hearing briefs on the issues addressed in this opinion. The UST timely filed a brief (Doc. 44), but the Debtor declined to do so.

from her means-test income those amounts that would have been necessary to retain the Former Residence in a Chapter 13 case and that, as a result, the presumption of abuse does not arise under § 707(b)(2). Given the Debtor's ability to pay a significant dividend to her unsecured creditors in a Chapter 13 case, however, the Court concludes that abuse does exist based on its application of the totality-of-the-circumstances standard set forth in § 707(b)(3). The Court, therefore, will enter an order granting the Motion and requiring the Debtor to file, within 20 days from the date of the entry of the order, a motion to convert her case to one under Chapter 13. If she does not timely file a motion to convert, the UST may submit an order dismissing this case.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## III. Background

On the Petition Date—February 15, 2008—the Debtor filed a voluntary Chapter 7 petition together with her schedules of assets and liabilities (Doc. 1). On Schedule A (real property in which the Debtor has an interest), the Debtor listed her fee simple interest in the Former Residence, subject to two mortgages. On Schedule D (creditors holding secured claims), she listed creditors holding secured claims in the aggregate amount of $137,488.77, including the two mortgages;

on Schedule E she listed one creditor holding a priority, unsecured tax claim in the amount of $800 for prepetition real estate taxes incurred on account of the Former Residence; and on Schedule F she listed creditors holding unsecured, nonpriority claims of $27,302.67. In addition to her schedules, the Debtor also filed a Statement of Intention (Doc. 4) on the Petition Date that reflected her intent to surrender the Former Residence.[2]

## A. The Means Test Form

The Debtor stated on her bankruptcy petition that her debts were primarily consumer in nature. As every debtor with primarily consumer debts is required to do, the Debtor filed a Form B22A Statement of Current Monthly Income and Means Test Calculation (Chapter 7) ("Means Test Form") (Doc. 1), the form used to implement § 707(b) in the context of a Chapter 7 case. According to the information provided on that form, the Debtor had a household of one, and her annualized monthly income as of the Petition Date exceeded the applicable median income for a household of that size, making her subject to the means test for determining whether there is a presumed abuse of the provisions of Chapter 7. *See* 11 U.S.C. § 707(b)(2). As an above-median income debtor, she was required to complete the remaining sections of the Means Test Form. She first entered $4,358.84 as the amount of her "current monthly income" (*i.e.,* her average monthly income derived during the six-month period prior

---

**2.** On February 28, 2008, the lender holding the first mortgage on the Former Residence filed a motion for relief from the automatic stay to exercise its remedies under state law (Doc. 12). On April 15, 2008, the Court entered an order (Doc. 21) granting the motion. On May 28, 2008, the Chapter 7 trustee filed an abandonment (Doc. 28) of the estate's in-

terest in the Former Residence because there was no equity for unsecured creditors. According to the Debtor's testimony at the Hearing, a foreclosure sale of the Former Residence was scheduled for December 1, 2008. The parties have not advised the Court whether the foreclosure sale has occurred.

to the Petition Date). *See* 11 U.S.C. § 101(10A). The UST does not contest this amount.

As instructed on the Means Test Form, the Debtor then made certain deductions from her current monthly income. Of particular relevance here, on line 43 (past due payments on secured claims), the Debtor deducted the monthly payments she would have been required to make if she had chosen to cure her mortgage arrearage and retain the Former Residence under a Chapter 13 plan. Similarly, on line 44 (prepetition priority claims), she deducted monthly payments for prepetition priority tax claims she would have been required to make to retain the Former Residence in Chapter 13. She then calculated the amount of her net monthly income as $7.30 and multiplied that amount by 60. *See* 11 U.S.C. § 707(b)(2)(A)(i). The product, $438, is below the minimum amount— $6,575—required to trigger the presumption of abuse under the means test. The Debtor, therefore, stated that the presumption of abuse did not arise.

The UST argues that, because the Debtor signaled her intention to surrender the Former Residence on the Petition Date and did, in fact, surrender it, the appropriate deduction on each of lines 43 and 44 is $0.[3] Accordingly, the monthly net income for the Debtor as calculated by the UST is substantially higher than the amount calculated by the Debtor. The product of the UST's recalculated net income for the Debtor times 60 is $10,494.60—below the threshold ($10,950) where presumed abuse exists without the need for further analysis, but above the amount ($6,575) below which no presumption arises and the analysis ends. The UST thus conducted the secondary presumption analysis provided for in § 707(b)(2)(A)(i)(I). Under this secondary analysis, a presumption of abuse arises if a debtor's income reduced by certain expenses and then multiplied by 60 exceeds a quarter of the debtor's nonpriority unsecured debt. Applying the secondary-presumption analysis here, the UST multiplied the Debtor's total nonpriority unsecured debt as reflected on the Debtor's Schedule F ($27,302.67) by .25. The product, $6,825.67, is less than $10,494.60, the Debtor's 60-month disposable income as calculated by the UST. Accordingly, the

**3.** The UST also questions the Debtor's deductions on other lines of the Means Test Form. On line 22A (Local Standards: transportation; vehicle operation/public transportation expense), the Debtor deducted a monthly transportation expense in the amount of $173, and on line 23 (Local Standards: ownership/lease expense) she deducted $478 on account of a vehicle she owns. The UST originally took the position that the deduction for the Debtor's transportation expense on line 22A should be $373 ($200 more than the amount claimed by the Debtor) because the Debtor's vehicle is old and has high mileage. Offsetting this, the UST argued that the correct deduction for line 23 (Local Standards: transportation; ownership/lease expense) is $0 rather than $478 because the Debtor owns her vehicle free and clear of liens. In light of the decision by the Bankruptcy Appellate Panel for the Sixth Circuit in *Hildebrand v. Kimbro (In re Kimbro)*, 389 B.R. 518 (6th Cir. BAP

2008) and this Court's decision in *Rhiel v. OhioHealth Corp. (In re Hunter)*, 380 B.R. 753, 772–75 (Bankr.S.D.Ohio 2008) concluding that it is bound by decisions of the Bankruptcy Appellate Panel for the Sixth Circuit, the UST has reconsidered his position regarding the ownership expense, conceding (for purposes of this case only) that the Debtor is entitled to the expense even though she owes no loan or lease payments on the vehicle. The UST has now reversed his position regarding the vehicle operating expense, contending that the Debtor is entitled to no more than the $173 amount she originally deducted. The Debtor, though, is now arguing that she should be able to take the ownership deduction as well as the operating deduction for an older vehicle with high mileage. Because the Court's decision regarding lines 43 and 44 results in no presumption of abuse, the Court need not wander into this thicket.

UST concluded that the presumption of abuse had arisen.

## B.   Schedules I and J

The UST also contends that, even if the Debtor's case is not subject to dismissal for presumed abuse under § 707(b)(2), the case should be dismissed under § 707(b)(3) because, when the Court considers the totality of the circumstances of the Debtor's financial situation, it should conclude that granting her relief would be an abuse of the provisions of Chapter 7. In support of this argument, the UST turns from the Means Test Form to Schedules I and J (Doc. 1), which the Debtor filed on the Petition Date. Schedule I is entitled "Current Income of Individual Debtor(s)." Unlike the Means Test Form—on which debtors must report their average monthly income derived during the six-month period prior to the commencement of bankruptcy—Schedule I requires debtors to report their projected average monthly income going forward from the commencement of the case.   Schedule J, entitled "Current Expenditures of Individual Debtor(s)," requires the same projections with respect to expenses.

Together, the Debtor's Schedules I and J show negative net monthly income.   No one would contend that a debtor could fund a feasible Chapter 13 plan with negative monthly income, and the UST does not do so here.   The UST, however, correctly notes that the Debtor actually has positive monthly income on Schedules I and J when taking into consideration the Debtor's stipulation that her monthly expenses after the Petition Date were re-

duced to $1,665.   *See* Docs. 38–40.   This reduction is primarily the result of the Debtor's surrendering the Former Residence and moving in with her mother on a rent-free basis so that, as of the date of the Hearing, the Debtor was no longer making mortgage payments or incurring associated expenses such as homeowner's insurance premiums.   *See* Docs. 38 & 40. The UST argues that, if the Debtor were required to include these expense reductions on Schedule J, she would have projected disposable monthly income as of the Hearing that would enable her to repay her creditors in full.[4]   The UST, therefore, contends that application of the totality-of-the-circumstances test leads to the inescapable conclusion that granting the Debtor relief would result in an abuse of the provisions of Chapter 7.

■   During the Hearing, the Debtor did not disavow the stipulation that her monthly expenses were $1,665 at that time. Rather, the Debtor argued that she anticipated a change in her circumstances and that, as a result, she believed she would incur increased expenses and would not have the ability to fund a Chapter 13 plan. In particular, the Debtor testified that, although she was living with her mother, she expected to move out within six to eight months so that she could reside closer to her place of employment.   Thus, the Debtor would incur additional housing expenses when she relocated.   In response, the UST argued that relocation by the Debtor was speculative.   The Court agrees with the UST on this issue and, having no evidence of changed circumstances since

---

**4.**   The UST also contends that amounts deducted from the Debtor's paycheck for her 401(k) contributions, 401(k) loan repayment and a vacation fund should be added back into her income on Schedule I. The UST calculates that these adjustments to Schedule I plus the adjustments to Schedule J would

leave the Debtor with additional disposable income per month.   But because the noncontested adjustments to Schedule J by themselves result in the Debtor having the ability to fund a Chapter 13 plan, the Court need not reach the issues raised by Schedule I.

the Hearing, is in no position to consider the Debtor's living arrangements beyond the date of the Hearing.

## IV. Legal Analysis

### A. Dismissal or Conversion Under § 707(b) Generally

Under § 707(b)(1), the Court "may dismiss a case filed by an individual debtor under [Chapter 7] whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of [the Bankruptcy Code], if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). The Debtor stated on her bankruptcy petition that her debts were primarily consumer in nature, and she submitted no evidence to the contrary during the Hearing. Thus, if granting the Debtor a discharge would be an abuse of the provisions of Chapter 7, the Court may dismiss her case or, if she chooses, allow her to convert it to Chapter 13.

### B. The Means Test and Presumed Abuse

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), courts had the authority to dismiss a case after finding that a discharge of the debtor would result in a "substantial abuse" of the provisions of Chapter 7 of the Bankruptcy Code. Without having canvassed the entirety of the case law on this point, the Court suspects that courts typically did not parse the line between abuse and substantial abuse so closely that the word "substantial" made a significant difference. *See In re Nockerts*, 357 B.R. 497, 507 n. 6 (Bankr.E.D.Wis.2006) ("'[F]ew, if any,

courts permitted a chapter 7 case to proceed because they found it to be an abuse, but not a substantial abuse, under prior law. If courts found cases to be abusive under the totality of the circumstances, those cases were dismissed.'" (quoting 6 Alan N. Resnick & Henry J. Somer, *Collier on Bankruptcy* ¶ 707.05[1] (15th ed. rev.2006))). Hence, the fact that courts now may dismiss a case after finding "abuse," 11 U.S.C. § 707(b)(1), whether or not it is "substantial," is of little moment.

More importantly, however, before BAPCPA, the law presumed that debtors were not abusing—in a substantial way or otherwise—the availability of a Chapter 7 discharge. Indeed, under former § 707(b)(1), there was "a presumption in favor of granting the relief requested by the debtor" (*i.e.*, a Chapter 7 discharge). This presumption flipped, however, with the enactment of BAPCPA. The new law eliminated the presumption in favor of debtors regardless of their income level. And for debtors with above-median income, the situation changed even more dramatically. A presumption of abuse now arises for above-median-income debtors who fail the means test of § 707(b)(2), unless they can rebut the presumption by demonstrating "special circumstances." 11 U.S.C. § 707(b)(2)(B).[5] Thus, the means test has changed what once was "a burden-free entrance" into Chapter 7, *In re Sorrell*, 359 B.R. 167, 179 (Bankr.S.D.Ohio 2007), into one fraught with obstacles.

The task of completing the Means Test Form and possibly facing the presumption of abuse falls only on above-median-income debtors, and here the Debtor concedes that her income is above the median for a debtor with a household of one in Ohio. Based on the figures in the Debtor's

---

**5.** The Debtor has not alleged any special circumstances. Accordingly, the question of

what constitutes "special circumstances" is not at issue here.

Means Test Form, her case is presumptively abusive if her "current monthly income reduced by [certain expenses discussed below], and multiplied by 60 is not less than the lesser of—(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950." *See* 11 U.S.C. § 707(b)(2)(A)(i). As discussed above, whether the Debtor passes or fails the means test turns on whether the deductions she took on lines 43 and 44 were proper.

## C. Application to the Debtor's Case

The Debtor and the UST start at a point of agreement—the amount of the Debtor's current monthly income—but diverge at the point where the Debtor takes expense deductions under § 707(b)(2)(A)(iii) and (iv). Those subsections state:

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

(iv) The debtor's expenses for payment of all priority claims (including priority child support and alimony claims) shall

be calculated as the total amount of debts entitled to priority, divided by 60. 11 U.S.C. § 707(b)(2)(A)(iii) and (iv). Line 43 of the Means Test Form implements subsection (iii)(II), and line 44 implements subsection (iv). The other subsection quoted above, (iii)(I), translates into line 42 of the Means Test Form, future payments on secured claims. Line 42 was the subject of *Sorrell*, 359 B.R. at 183–87, a decision with which the UST expressly disagreed during the Hearing and in his posthearing brief and whose result he hopes to avoid here in the context of lines 43 and 44. A discussion of *Sorrell*, therefore, is in order.

In *Sorrell*, the UST moved to dismiss the above-median-income joint debtors' bankruptcy case for abuse, arguing, among other things, that the presumption of abuse arose under the means test. The UST focused on line 42 of the Means Test Form, on which the debtors had deducted an amount reflecting the payments due on their motor vehicle in the 60 months following the petition date.[6] The UST opposed this deduction because the debtors intended to surrender the vehicle and thus would not be making the payments. According to the UST, the debtors' intent to surrender the vehicle and consequent nonpayment of the car loan vitiated any argument that the car payments were "scheduled as contractually due" as of the petition date. 11 U.S.C. § 707(b)(2)(A)(iii)(I). *See Sorrell*, 359 B.R. at 171. In response, the debtors argued that the payments were, despite their surrender of the vehicle, scheduled as contractually due under the payment schedule provided for in their agreement with the lender. *See Sorrell*, 359 B.R. at

---

**6.** The amount for which the monthly deduction is permitted is not necessarily the actual monthly payment due for any particular month of the loan agreement, but rather the average monthly payment "calculated as the

sum of … the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition" divided by 60. 11 U.S.C. § 707(b)(2)(A)(iii)(I).

171. After a thorough review of the principles of statutory interpretation and the Supreme Court's case law applying the plain meaning rule in the bankruptcy context, *see id.* at 173, the *Sorrell* court denied the UST's motion to dismiss and held that the debtors could deduct the monthly payments even though they intended to surrender the vehicle. *See id.* at 184 ("[T]he position that there should not be an allowed deduction for a payment which may not be made ... rests on the premise that Congress's choice of language in the applicable sections cannot be accorded its plain meaning. This premise is not supported by any recognized exception to the mandatory [canon] of according Congressional enactments their plain meaning."). Rejecting the UST's argument that the phrase "scheduled as" referred to the debtors' schedules of assets and liabilities, the *Sorrell* court noted that, even if it were to accept the UST's interpretation of the phrase "scheduled as," the UST nonetheless would not prevail on his presumption-of-abuse argument because the statement of intention is not a bankruptcy schedule. *See id.* at 185 ("There is no bankruptcy schedule that requires the debtor to list all amounts due to secured creditors in each of the 60 months following the date of the petition[.] So, there is no bankruptcy schedule to which § 707(b)(2)(A)(iii) could refer." (internal quotation marks omitted)).

*Sorrell* acknowledged the split of authority on the issue of whether a debtor may take a line 42 deduction for payments on surrendered property. *See id.* at 187 n. 15 (citing *In re Skaggs*, 349 B.R. 594 (Bankr. E.D.Mo.2006), for the contrary view—i.e., disallowing the line 42 deduction for debtors who had stated their intention to sur-

render their automobile and mobile home). For an example of another decision decided contrary to *Sorrell,* see *In re Burden,* 380 B.R. 194, 201–02 (Bankr.W.D.Mo. 2007). The Sixth Circuit Bankruptcy Appellate Panel, however, has sided with those courts permitting the deduction regardless of the debtor's intent to surrender, which for the time being appears to be the majority view. *See Hilderbrand v. Thomas (In re Thomas),* 395 B.R. 914, 920–22 (6th Cir. BAP 2008) ("The cases cited above hold that the plain meaning of § 707(b)(2)(A)(iii) compels a finding that a chapter 7 debtor, for purposes of determining whether a filing is abusive, may deduct payments for collateral a debtor intends to surrender.... This Panel concurs with the decisions cited above to the extent they find that the means test is a mechanical, formulaic approach that as applied is no different in chapter 7 than it is in chapter 13.").[7] While *Thomas* involved the calculation of a Chapter 13 debtor's disposable income, not the net income of a Chapter 7 debtor, the Court nonetheless considers it persuasive authority in this context.

■ Here, on line 42, the Debtor deducted an amount for the regular mortgage payments on the Former Residence, potentially giving rise to the same issue presented in *Sorrell.* But the UST expressly stated in the Motion that, in light of this Court's having previously followed *Sorrell* in an unreported decision, *see In re Goss,* Case No. 06–56264 (Doc. 31), he was not objecting to the line 42 deduction. *See* Motion at 3 n. 1. The Court notes that, if faced with the issue again, the Court would, as the case law now stands, follow

---

7. At least one court has held that a debtor may deduct payments on secured debt under § 707(b)(2)(A)(iii)(I) if the debtor has merely stated an intent to surrender the collateral securing the debt, but not if the creditor has received relief from the automatic stay. *See, e.g., In re Singletary,* 354 B.R. 455, 469–70 (Bankr.S.D.Tex.2006).

*Sorrell,* especially in light of *Thomas.*[8] The UST, however, contends that the language of subsections 707(b)(2)(iii)(II) and (iv) mandate a different result for lines 43 and 44.

### 1. Line 43

■ The UST contests the line 43 deduction, arguing as follows:

> Section 707(b)(2)(A)(iii)(II), and Line 43 of the Means Test [Form,] [are] vastly different than § 707(b)(2)(A)(iii)(I) and Line 42 as discussed in *Sorrell.* While *Sorrell* focused on payments "scheduled as contractually due[,]" the relevant code language for Line 43 focuses on additional payments to maintain possession of the real estate for purposes of a Chapter 13 plan. Said another way, this allows for payments of the arrearage on the secured debt if the [debtors] intend to maintain possession of the property.
>
> ... It is, therefore, counter-intuitive to allow a Debtor the benefit of a deduction for an arrearage for property that she had no intention of maintaining possession of, and for which she is no longer paying.

United States Trustee's Post–Trial Br. at 3 ("Post–Trial Br.") (Doc. 44) (footnotes omitted). During the Hearing, the attorney for the UST disclaimed knowledge of any case law regarding line 43 and thereafter failed to cite any in the UST's post-hearing brief. Debtor's counsel likewise was unaware of any authority and, as already noted, opted not to file a post-hearing brief. The Court's own research, however, uncovered four decisions containing holdings regarding line 43, including one decision from this district.

Perhaps not surprisingly, in these decisions, as line 42 goes, so goes line 43. In the two decisions in which the courts disallowed the line 42 deduction, the courts, without any separate analysis, also disallowed the line 43 deduction. *See In re Masur,* 2007 WL 3231725 at *4 (Bankr. D.S.D. Oct.30, 2007) ("Debtors' monthly expenses must therefore be reduced by ... the average monthly payments claimed on Line 42.... For the same reasons, Debtors' monthly expenses must also be reduced by ... the total 'cure amount' claimed on Line 43 of their Amended Official Form B22A for their home."); *Skaggs,* 349 B.R. at 600 (disallowing line 42 and line 43 deductions for future payments and cure payments on mobile home the Chapter 7 debtors intended to surrender).

Conversely, in the two decisions in which the courts—including a court in this district—allowed deductions on line 42 despite the debtors' surrender of the collateral, the courts also allowed deductions on line 43. *See In re Kelvie,* 372 B.R. 56, 62 (Bankr.D.Idaho 2007) ("The Court therefore concludes that Debtors may deduct their monthly house and motor home payments. These obligations were contractual and remained outstanding at the time of filing. Upon calculating and deducting the monthly secured debt payments under § 707(b)(2)(A)(iii) for the house and motor home, the expenses on lines 42 and 43 of the UST's Form 22A, Ex. 10, will increase...."); *In re Graham,* 363 B.R. 844, 849 (Bankr.S.D.Ohio 2007) (Preston, J.)

---

8. The result in *Sorrell* and similar cases might have been different if a judgment of foreclosure had been entered prepetition. *See In re Ballard,* 2008 WL 783408 at *5 (Bankr. N.D.Ohio Mar.25, 2008) ("When a prepetition judgment of foreclosure is entered, the underlying contract is merged into the judgment, thereby extinguishing the contractual terms. The dissipation of the contract means that no amounts are 'contractually due' and therefore Debtors may not claim an expense deduction for the mortgage on Line 42."). Here, no judgment of foreclosure was entered before the Petition Date.

("This Court need not reiterate the discussion and conclusions of Judge Waldron [in *Sorrell*]; suffice it to say that for all of the reasons articulated and explained in his well-written and well-considered opinion, this Court finds that § 707(b)(2)(A)(iii) requires that the Debtors include the contractual payments for the real estate in the calculation of disposable income on Form 22. The same applies to the entry on line 43 of Form 22 regarding past-due payments on secured claims.").

The Court will follow *Kelvie* and *Graham* and allow the Debtor's deduction on line 43. "[S]ome portions of the Means Test Form permit [debtors] to make deductions for only actual expenses they will continue to have in the future[.]" *In re Simmons*, 357 B.R. 480, 486 (Bankr. N.D.Ohio 2006).[9] Section 707(b)(2)(A)(iii)(II), however, "is simply not one of those sections and this Court will not read into that statutory provision a forward looking element that Congress did not include." *Id.* (reaching the same conclusion in the context of § 707(b)(2)(A)(iii)(I). Rather, in the context of a Chapter 7 case of a debtor who, like this Debtor, owns a residence on the date she commences bankruptcy, line 43 permits a deduction based on a hypothetical situation—the retention of the debtor's primary residence under a Chapter 13 plan. That the circumstances are hypothetical is evidenced by the incontrovertible fact that the Debtor is in Chapter 7; if she had intended to maintain possession of the Former Residence, she presumably would have filed a Chapter 13 case. *See, e.g., In re Whitlock*, 308 B.R. 917, 923 (Bankr.M.D.Ga.2004) ("One of the primary reasons why Congress created Chapter 13

of the Bankruptcy Code was to afford debtors an opportunity to save their residences."); *In re Smith*, 1999 WL 33582223 at *2 (Bankr.C.D.Ill.1999) ("A primary purpose of Chapter 13 is to allow debtors to save their homes from foreclosure.").

No one could reasonably argue that the Debtor should be denied the line 43 deduction under § 707(b)(2)(A)(iii)(II) merely because she failed to file a Chapter 13 plan—a circumstance that, by definition is hypothetical in the context of a Chapter 7 case. Likewise, the Court finds no sound basis for requiring disallowance of the deduction for mortgage cure payments on line 43 merely because the Debtor did not intend to retain the Former Residence on the Petition Date and did not actually retain it thereafter. *See In re Castillo*, 2008 WL 4544467 at *3 (Bankr.S.D.Fla. Oct.10, 2008) (stating in dictum that "[t]he Court does not agree that § 707(b)(2)(A)(iii)(II) speaks to a debtor's intent to maintain possession of the debtor's 'primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts' " but that "[s]ection 707(b)(2)(A)(iii)(II) merely allows a deduction on the means test for payments necessary to cure any pre-petition arrearage for such property").

If the Debtor had filed her case under Chapter 13 and attempted to retain the Former Residence, she would have needed to cure, through her Chapter 13 plan, the mortgage arrearage payments for which she took the line 43 deduction. Thus, the line 43 deduction is "necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence . . . ." 11 U.S.C.

---

**9.** In this regard, the *Simmons* court specifically referenced, without ruling on, line 35 of the Means Test Form, which permits deductions of continued contributions to the care of

household or family members under § 707(b)(2)(A)(ii)(II). *See Simmons*, 357 B.R. at 486.

§ 707(b)(2)(A)(iii)(II). The Debtor's line 43 deduction, therefore, is appropriate.

### 2. Line 44

■ This brings the Court to line 44. According to the UST:

[T]he Debtor should also not receive the benefit of a deduction for priority claims as they relate to surrendered real estate. Once [d]ebtors surrender the real estate, the obligation for the real estate taxes runs with the land and becomes the responsibility of the bona fide purchaser at a Sheriff's Sale. Upon surrender, the Debtor no longer has an obligation to pay the real estate taxes. As such, [d]ebtors should not receive a deduction on Line 44 of the Means Test for real estate taxes on real property which has been surrendered and will not be maintained.

Post–Trial Br. at 3–4 (footnote omitted). The UST is correct that Ohio real property taxes are not personal but instead run with the land. *See S. Ohio Sav. Bank & Trust Co. v. Bolce,* 165 Ohio St. 201, 135 N.E.2d 382, 387 (1956) ("Under the taxation scheme of this state, real estate taxes run with the land, attach to the real estate itself, become direct and specific liens thereon, and underlie the owner's interest therein."). For the reasons explained below, however, this rule of law does not win the day for the UST as to line 44.

■ The Debtor owned the Former Residence as of the Petition Date. A claim against property of the Debtor, such as the Former Residence, is a claim against the Debtor. *See* 11 U.S.C. § 102(2); *Glance v. Carroll (In re Glance),* 487 F.3d 317, 321 (6th Cir.2007) ("Nor need the debtor be personally liable on a claim for it to be valid; the Code provides that a 'claim against the debtor' 'includes [a] claim against property of the debtor.'" (quoting 11 U.S.C. § 102(2))). For purposes of the Bankruptcy Code, therefore, the taxing authority had a claim against the Debtor for the prepetition real estate tax listed on the Debtor's Schedule E. This claim is entitled to priority under § 507(a)(8)(B), which provides priority status for "a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition[.]" 11 U.S.C. § 507(a)(8)(B). And, under § 707(b)(2)(A)(iv), which line 44 implements, the Debtor may deduct her "expenses for payment of all priority claims ... calculated as the total amount of debts entitled to priority, divided by 60." 11 U.S.C. § 707(b)(2)(A)(iv).

■ The UST disputes none of this. Rather, the UST relies on the fact that the claim likely will be satisfied out of the proceeds of the sale of the Former Residence at foreclosure, not by the Debtor. That may be true, but it is of no moment. The Debtor's expense on line 44 is to be "calculated as the total amount of debts entitled to priority" without regard to how the priority claim will be satisfied or even whether it will be satisfied. *See In re Robinette,* 2007 WL 2955960 at *3 (Bankr. D.N.M. Oct.2, 2007) ("[The creditor] argues that, if the IRS and [the taxing authority] had offset the tax refunds, the priority debt would have been much smaller, entitling Debtors to a smaller deduction on line 44. The Court finds that it should not compute this offset. The fact is that on the petition date, Debtors owed [the tax]. Form 22A represents a snapshot of financial condition on the petition date."). For these reasons, the Court concludes that the Debtor is entitled to the deduction on line 44.

In summary, the deductions taken by the Debtor on lines 43 and 44 of the Means Test Form are appropriate. As a result, the presumption of abuse does not arise.

## D. Abuse Under the Totality of the Circumstances

■ Having successfully completed the obstacle course of the means test, the Debtor emerges at the other end only to face another provision added by BAPCPA, § 707(b)(3), which states:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3). Where, as here, there is no presumed abuse, the UST has the burden of proving that the totality of the circumstances of the Debtor's financial situation demonstrates that granting her a discharge would be an abuse of the provisions of Chapter 7. *See In re Perrotta*, 378 B.R. 434, 437 (Bankr.D.N.H.2007) ("[W]here the presumption of abuse does not arise, the burden of proof is on the moving party to establish that the case was filed in bad faith or that the totality of the circumstances of a debtor's financial situation demonstrate abuse.").[10]

There is no dispute that the Court has the authority to dismiss a debtor's case or, with consent, convert it to a case under Chapter 13, if the totality of the circumstances of the debtor's financial situation demonstrates abuse. This is true even though the means test demonstrates no abuse. *See Schultz v. United States*, 529 F.3d 343, 348 (6th Cir.) ("[E]ven if the presumption of abuse does not apply, or has been rebutted by the debtor, the BAPCPA empowers a bankruptcy court to consider whether it believes ... 'the totality of the circumstances ... of the debtor's financial situation demonstrates abuse.'" (quoting 11 U.S.C. § 707(b)(3))), *cert. denied*, ___ U.S. ___, 129 S.Ct. 742, 172 L.Ed.2d 730 (2008). To an above-median-income debtor, this may seem like the bankruptcy equivalent of successfully running the gauntlet only to be sent back through the line a second time.

The current state of the law, therefore, raises the question of what rules govern the second run through the gauntlet for the above-median-income debtor. Having already passed the means test, should the Court subject the Debtor to further scrutiny—in connection with its review of the totality of the circumstances—by analyzing her ability to pay creditors? *See In re Booker*, 399 B.R. 662, 665–66 (Bankr. W.D.Mo.2009) ("The detailed screening process, embodied in the means test, through which debtors seeking relief under Chapter 7 are required to pass after BAPCPA prompted an initial debate in the academic literature with regard to whether ability to pay continued to be an appropriate consideration for the court in deciding whether the granting of ... relief would

---

**10.** The UST does not allege, and the Court finds no evidence of, bad faith on the part of the Debtor. *See In re Harter*, 2008 WL 3875370 at *2 (Bankr.N.D.Cal. Aug.19, 2008) ("Dismissal based on lack of good faith ... is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." (citing *Indus. Ins. Serv., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir.1991)).

be an abuse under § 707(b)(3).").[11] And, if so, should the Court's calculation of her ability to pay be based in part on postpetition events such as her belt-tightening (*i.e.*, her reduction of living expenses as a result of surrendering the Former Residence and moving in with her mother)? Unfortunately for the Debtor, the answer to both questions is "yes." To explain why, a brief history lesson is in order.

As noted above, prior to BAPCPA, there was no means test, and no presumption of abuse ever arose. Section 707(b) permitted dismissal for "substantial abuse," but the Bankruptcy Code left the task of defining that amorphous term to the courts. *See Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir.2004) ("Congress chose not to define the term 'substantial abuse,' leaving it to the courts to decide how it should be determined."). Taking up the challenge, the United States Court of Appeals for the Sixth Circuit held that "[s]ubstantial abuse can be predicated upon either lack of honesty or want of need." *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989). According to the Sixth Circuit, an analysis of lack of honesty must include an analysis of a debtor's good faith, *see id.* at 126, which the Court already has determined is not at issue in this case. More to the point here, the Sixth Circuit held that courts must analyze "want of need" under a multi-factor analysis:

> Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future

earnings. That factor alone may be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Id.* at 126–27 (citations omitted). The Sixth Circuit has denominated these non-exclusive factors and any other factors relevant to the particular debtor's case as the "totality of the circumstances." *Id.* at 126. *See also Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir.1991) (citing *Krohn* and other cases for the proposition that "the majority of the cases hold that the debtor's ability to repay is the primary factor to be considered[ ]" in the abuse analysis and that "[t]he consensus among these courts is that the substantial abuse determination must be made on a case-by-case basis, in light of the totality of the circumstances").

---

**11.** *Compare* Marianne B. Culhane & Michaela M. White, *Catching Can–Pay Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr.Inst. L.Rev. 665, 666 (2005) ("Congress intended the means test to be the only test of ability to pay under the revised Code. With the detailed statutory means test in place, 'filed in bad faith' and 'totality of the circumstances' no longer authorize judges to define ability to pay. Instead, these phrases must be read as limited to serious debtor misconduct.") *with*

Eugene R. Wedoff, *Judicial Discretion to Find Abuse Under Section 707(b)(3)*, 71 Mo. L.Rev. 1035, 1051 (2006) ("BAPCPA did not ... mak[e] the means test the conclusive means of determining a debtor's debt-paying ability. Rather, the means test is only the starting point in such a determination. When an abuse is asserted under section 707(b)(3) judges are required to determine the debtor's actual financial condition, including debt-paying ability.").

■ The totality-of-the-circumstances language should sound familiar. It is, of course, the same language used in new § 707(b)(3)(B). The totality-of-the-circumstances analysis, therefore, is "best understood as a codification of pre-BAPCPA case law[.]" *In re Oot*, 368 B.R. 662, 665 (Bankr.N.D.Ohio 2007); *see also In re Short*, 2008 WL 2020200 at *2 (Bankr. D.Neb. May 8, 2008) ("[C]ourts have found that 'substantial abuse' pre-BAPCPA could be predicated upon either lack of honesty *or* want of need, and Congress incorporated that construct into § 707(b)(3)(B)."); *In re Hess*, 2007 WL 3028422 at *2 (Bankr. N.D.Ohio Oct.15, 2007) ("[In] *In re Krohn* ... [t]he Sixth Circuit explained that 'substantial abuse' could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. Congress incorporated this judicially created construct in § 707(b)(3) ...." (citation omitted)).

■ The Court's review of the totality of the circumstances under § 707(b)(3), therefore, should include an analysis of the Debtor's situation using the factors enumerated in *Krohn*. Prior to BAPCPA, the Sixth Circuit had held in *Krohn* that the ability or inability to pay was a critical factor and may support a finding of substantial abuse even absent bad faith. *See Behlke*, 358 F.3d at 434–35 ("Debtors argue, in disregard of *Krohn*, that it was error for the bankruptcy court to find substantial abuse in the absence of evidence of unfair dealing or bad faith on their part.... *Krohn* clearly holds that the ability to pay may be but is not necessarily sufficient to warrant dismissal for substantial abuse."). Thus, as in *Krohn*, under the totality-of-the-circumstances analysis of § 707(b)(3), "[w]hether a debtor has the ability to repay his or her creditors is an often central consideration when assessing a debtor's need." *In re Harter*, 397 B.R. 860, 863 (Bankr.N.D.Ohio Nov.5,

2008). And "[a] frequently utilized measure, when determining whether a debtor has the ability to repay [his or her] debts, is to ascertain whether, under a hypothetical Chapter 13 repayment plan, the debtor could repay a meaningful percentage of his or her unsecured debts." *Id. See also Booker*, 399 B.R. 662, 2009 WL 160252 at *2 ("[T]he vast majority of courts considering the question has determined that ability to pay continues to be an appropriate consideration in requests for dismissal pursuant to § 707(b)(3)."); *In re Mestemaker*, 359 B.R. 849, 854–55 (Bankr. N.D.Ohio 2007) ("The plain meaning of the phrase 'debtor's financial situation' must include a debtor's actual income and expenses, since such information is the starting point for any analysis of an individual's financial situation. There is no provision in § 707(b) stating that the means test is the only method through which a court may determine whether there is abuse based on a debtor's ability to pay.").

■ A review of the totality of the circumstances, therefore, should include an evaluation of the Debtor's postpetition financial situation, including her circumstances as they existed at the time of the Hearing. *See, e.g., In re Seeburger*, 392 B.R. 735, 741 (Bankr.N.D.Ohio 2008) (holding that the "totality of the circumstances test allows the court to consider both prepetition and postpetition circumstances"); *In re Haar*, 373 B.R. 493, 502–03 (Bankr. N.D.Ohio 2007) (same); *In re Henebury*, 361 B.R. 595, 612 (Bankr.S.D.Fla.2007) (holding that the debtor's postpetition financial situation was relevant to a § 707(b)(3) analysis); *In re Hartwick*, 359 B.R. 16, 22 (Bankr.D.N.H.2007) (holding that under § 707(b)(3)'s totality-of-circumstances test the court must consider the debtor's financial circumstances at the time the motion to dismiss was heard); *In re Pennington*, 348 B.R. 647, 651 (Bankr. D.Del.2006) (holding that the Court "must consider the Debtor's financial condition at

the time of the hearing on the motion to dismiss in determining whether granting chapter 7 relief is an abuse under section 707(b)(3)"). *But cf. In re Huval,* 2006 WL 2846882 at *2 (Bankr.W.D.La. June 21, 2006) ("The court believes that the only appropriate point to examine whether the granting of relief would be a substantial abuse pursuant to section 707(b) [under pre-BAPCPA law] is at the date of filing. The date of filing is a definitive date in time at which all facts can be established. There is no other definitive date in time to examine all facts.").

Moreover, applying § 707(b)(3), courts regularly have dismissed cases (or permitted debtors to convert them to Chapter 13) based on the debtors' ability to fund Chapter 13 plans. Courts have done so even where the genesis of the debtors' positive projected disposable income going forward was the postpetition surrender of a residence or other collateral and the resulting decrease in secured debt. *See In re Walker,* 383 B.R. 830, 836 (Bankr.N.D.Ga.2008) (surrender of residence and motor vehicle); *In re Maya,* 374 B.R. 750, 755 (Bankr. S.D.Cal.2007) (same); *Hess,* 2007 WL 3028422 at *4 (surrender of residence); *In re Zuccarell,* 373 B.R. 508, 512 (Bankr. N.D.Ohio 2007) (same); *Haar,* 373 B.R. at 501 (same); *In re Hare,* 2007 WL 201249 at *4 (Bankr.E.D.Cal. Jan.24, 2007) (same); *Pennington,* 348 B.R. at 651–52 (surrender of motor vehicle). The Court agrees that nothing in § 707(b)(3) suggests that "Congress intended the Court to distinguish between debtors who have always had disposable income available and debtors who have become able to pay their debts either due to an increase in income or a decrease in expenses, including a decrease that results from the surrender of collateral." *Walker,* 383 B.R. at 836.

Applying the law set forth above to the facts of the Debtor's case, the Court concludes that the UST has carried his burden of proving that abuse exists under the totality of the circumstances of the Debtor's financial situation. The Debtor has a stable source of future income. She has been employed for approximately five years as a Tech III at the Coca–Cola Company. Her average net monthly income from this employment going forward as listed on Schedule I is $2,527.72. Her average monthly expenses listed on Schedule J (minus the mortgages on the Former Residence) are $1,703.14. In this jurisdiction, Schedules I and J, not the Means Test Form, are the starting point for determining projected disposable income in a Chapter 13 case. *See Hildebrand v. Petro (In re Petro),* 395 B.R. 369, 378 (6th Cir. BAP 2008) ("Schedule I and J capture a snapshot as of the date of filing for relief under the Bankruptcy Code.... A debtor's projected disposable income should be calculated based on the realities of the debtor's circumstances as of confirmation and as reasonably anticipated to be during the length of the plan."); *see also Thomas,* 395 B.R. at 923. The Debtor, therefore, has the ability to repay a substantial portion of her debts out of her projected disposable income. Considering all of these factors, the Court concludes that the totality of the circumstances of the Debtor's financial situation demonstrates abuse.

### V. Conclusion

For the foregoing reasons, the Motion is **GRANTED.** The Court will enter a separate order in accordance with this memorandum opinion providing that the Debtor's Chapter 7 case will be dismissed unless, within 20 days from the date of the order, she files a motion to convert her case to one under Chapter 13.

**IT IS SO ORDERED.**