**In re Janice E. PHILLIPS, Debtor.**

**No. 08–35148.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
at Dayton.

Sept. 22, 2009.

Andrew Zeigler, Thompson & Deveny Co. LPA, Dayton, OH, for Debtor.

**DECISION GRANTING UNITED STATES TRUSTEE'S MOTION TO DISMISS BUT ALLOWING TIME FOR DEBTOR TO CONVERT TO CHAPTER 13**

LAWRENCE S. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the standing General Order of Reference in this district. This matter is before the court on the Motion of the United States Trustee to Dismiss Pursuant to 11 U.S.C. §§ 707(b)(2) or 707(b)(3) [doc. 23], the Debtor's Response [doc. 28], and the Stipulations of Fact Between the United States Trustee and the Debtor [doc. 36].

In its motion to dismiss, the United States Trustee ("UST") questions calculations on Official Form 22A, also known as the "means test form," [1] that was filed by Debtor Janice E. Phillips ("Debtor") with her petition and schedules. More specifically, the UST asserts that it was improper for the Debtor to take deductions for payment of mortgages and taxes on a house that was surrendered by the Debtor prior to her bankruptcy filing. If the deductions are eliminated from the calculation of disposable income on the means test form, the UST asserts that a presumption of abuse would arise under 11 U.S.C. § 707(b)(2) requiring dismissal or conversion of the Debtor's bankruptcy case.

Alternatively, the UST asserts that the Debtor's Chapter 7 filing constitutes an abuse under the "totality of the circumstances" test pursuant to 11 U.S.C. § 707(b)(3). The UST argues that the Debtor has significant disposable income with which to pay creditors should her case be dismissed or converted to Chapter 13. The UST relies on the availability of funds that the Debtor presently pays into a voluntary retirement plan as well as funds currently used to repay loans from her retirement plan. Outside of a Chapter 7 case, the UST argues that those funds

---

1. Official Form 22A is designed to implement the so-called means test of 11 U.S.C. § 707(b) and must be filed in all consumer cases pursuant to 11 U.S.C. §§ 521(a)(1)(B)(ii) and 707(b)(2)(C).

could be used to make a significant repayment to the Debtor's unsecured creditors.

Following a hearing held by the court on April 15, 2009, the court reviewed the parties' arguments and testimony as well as the filed documents. As explained in the decision below, the court concludes that the language of § 707(b)(2) allows the Debtor to take deductions on her means test form for payments towards unextinguished obligations for mortgages and taxes pertaining to a home that is to be or has been surrendered. Consequently, the Debtor's deductions were appropriate and no presumption of abuse arises in this case under § 707(b)(2). However, the court's "totality of the circumstances" analysis pursuant to § 707(b)(3) indicates that the Debtor has the ability to pay a meaningful distribution to unsecured creditors in a Chapter 13 case and her Chapter 7 case therefore constitutes an abuse requiring either dismissal of the case or conversion to Chapter 13.

## FINDINGS OF FACT

On October 17, 2008, the Debtor, a single woman in her mid-fifties with no dependents, filed her Chapter 7 bankruptcy petition and schedules. The Debtor scheduled secured debts totaling $115,928 and unsecured debts of $71,378. The debts are primarily consumer in nature and amount. The Debtor also filed her means test form indicating that she had income that was above the median income for a household of one in the State of Ohio. The form included a calculation of monthly disposable income[2] that, when multiplied by 60 was more than $6,575, but less than $10,950 and also was less than twenty-five percent (25%) of the nonpriority unsecured claims. Accordingly, the Debtor checked a box on the form noting that the "presumption of abuse" did not arise in her case.

At the time of her bankruptcy filing, the Debtor scheduled an ownership interest in real property located at 2013 Pittsfield Street in Kettering, Ohio where she had lived since 1994. She vacated the house and surrendered it to the mortgage company in May of 2008, prior to the bankruptcy filing. The last mortgage payment she made was in April or May of 2008. However, the Debtor remained contractually obligated to make the payments on the mortgage note.[3]

Although the Debtor vacated and surrendered the property prior to her bankruptcy filing, she took deductions related to the property on the means test form. On Line 42(a), the Debtor listed $780 as her average monthly payment on her first mortgage on the Pittsfield property. On Line 42(b), the Debtor listed an additional $320 per month for a second mortgage owed to the same mortgage holder.[4] On Line 43, the Debtor listed $14 for past due payments owed to the Montgomery County Treasurer for real estate taxes on the Pittsfield property.

The UST takes the position that it is inappropriate for the Debtor to take deductions for expenses related to a parcel of property surrendered prior to the bank-

---

**2.** The Debtor's monthly disposable income figure on line 50 of the means test form was $133.46.

**3.** Although not a stipulated fact, the court must assume this to be true because the UST, who has the burden of proof on the issues of "abuse," did not establish or even suggest that the Debtor was not so obligated or that the Debtor's scheduling of the mortgage debt

was inaccurate. As a consequence, this decision does not address situations in which a mortgage note has been cancelled prior to the bankruptcy filing.

**4.** The Debtor did not include a deduction for the amount of the arrearage owed on the date of the filing.

ruptcy. At the hearing, UST Paralegal Specialist Erik Van Bramer,[5] assigned to review the means test form and schedules filed by the Debtor in this case, testified as to the computed result if the court were to adopt the UST's argument. According to Mr. Van Bramer and the UST's calculations, if payments on the surrendered property were eliminated as deductions on the means test form and were replaced by the IRS's standard deduction of $687 for housing, the Debtor would have $587.27[6] in monthly disposable income or $35,326.03 over five years such that the presumption of abuse would arise under § 707(b)(2).[7]

In addition to the deductions related to the surrendered property, Mr. Van Bramer pointed out an error on the Debtor's means test form respecting health care expenses. Mr. Van Bramer noted a potential doubling of the Debtor's health care expenses through the deductions on Line 19B (a standard deduction for health care), Line 34(c) (a deduction for amounts placed in a health care savings account), and Line 31 (a deduction for out-of-pocket expenses beyond those deducted on Line 34(c) and Line 19B). The Debtor's testimony supported Mr. Van Bramer's observation. She testified that her out-of-pocket expenses beyond those paid through the health care savings account were approximately $50 per month and, therefore, were not in excess of the standard deduction for health care on Line 19B. Consequently, the Debtor's deduction on Line 31 should be reduced from $43 to $0 leading to a corresponding increase in monthly disposable income on the means test form.

Alternatively, the UST submits that the Debtor's Chapter 7 case is an abuse pursuant to the § 707(b)(3) "totality of the circumstances" test. For this argument, the UST focuses on the Debtor's budget as disclosed in her schedules and through her testimony. The Debtor is a thirty year employee of the United States Postal Service. Her Schedule I indicates a gross monthly income of $4,483.31 per month.

---

5. Mr. Van Bramer has been a paralegal for eleven years and has worked for the UST's office for two and a half years. Mr. Van Bramer's job duties include reviewing bankruptcy means tests and schedules in Chapter 7 cases.

6. *See* UST's Ex. 2. The disposable income amount reflects a decrease in Chapter 13 administrative expenses, which is calculated as a multiplier of the projected average monthly Chapter 13 plan payment, on Line 45 of the means test.

7. Mr. Van Bramer testified to other items that might be artificially reducing the Debtor's calculation of her disposable income on the means test form. He asserted that the Debtor's employer might be withholding too much of her gross income because the Debtor received a federal tax refund of $1,009 for 2008. *See In re Hale*, 2007 WL 2990760 (Bankr. N.D.Ohio Oct.10, 2007) (indicating that joint debtors who received a tax refund because of overwithholding can only deduct their actual current tax expense, rather than the amount withheld from their pay checks, on the means test form). However, the Debtor testified that her 2008 tax refund was because of itemized tax deductions that no longer apply due to the surrender of her home and, as such, her current withholding is correct. Furthermore, Mr. Van Bramer noted that an $83 monthly expense that the Debtor listed on Line 27 for life insurance was no longer being paid by the Debtor. However, the Debtor stated that she was in the process of looking for a replacement policy along the same lines as the one she had dropped and Mr. Van Bramer stated that payment of such a policy was generally allowed on the means test form if the expense exists at the time of filing. The court notes that it offered both the UST and the Debtor the opportunity to file supplemental briefs to better inform the court as to the appropriate calculations of these numbers; however, neither party chose to do so. The court concludes that the UST did not demonstrate that these line items were inappropriate or incorrectly calculated at the time that the Debtor filed the petition and means test form.

On the same schedule, the Debtor lists monthly payroll deductions of $313.06 for retirement contributions to the CSRS, $357.78 for retirement contributions to a Thrift Savings Plan ("TSP") account, and $436.11 for TSP loan repayments. The Debtor testified that the $436.11 is deducted from her paycheck for repayment of two separate loans from her TSP retirement account. Approximately $100 is paid monthly towards a 1994 loan she used for a down payment on her house. The balance of this first loan is $700 and should be paid off in seven months. She borrowed an additional $20,000, the second loan, a few years ago to pay off some credit card debts. The balance owed is $12,500. She pays approximately $336.11 towards this second loan each month and it will be paid off in approximately 36 months.

With respect to her retirement contributions, the Debtor testified that the $313.08 she pays into the CSRS is mandatory. As long as she retires with thirty years of service and at age 55, two requirements she has already met, she will receive a yearly amount from the CSRS matching 56% of her salary. Each year that she continues to work, there will be a corresponding 2% increase in the percentage of salary that she will receive upon retirement.

Unlike the contributions the Debtor pays into the CSRS, the $357.78 that she pays in monthly contributions to her TSP retirement account is voluntary. Presently, she has saved approximately $39,000 in her TSP account and hopes to retire within five years.

At the hearing, Mr. Van Bramer testified that if the Debtor stopped the monthly TSP contributions and repayment of her TSP loans, the Debtor would have approximately $794.00 in monthly disposable income with which to pay creditors. However, the Debtor noted that if she stopped payment on her TSP loans, there would be a ten percent (10%) penalty and the balance of the loans would become taxable income.

With respect to the Debtor's expenses listed on Schedule J, the UST did not question the accuracy of most of them nor did the UST feel that her budget was unreasonable. Nonetheless, the Debtor did admit that her health care expense, stated as $100 per month in excess of the funds paid out of her health care savings account, was probably $50 too high. The Debtor further testified that some of her expenses were expected to increase in the near future. The Debtor believes that she will need to replace her only vehicle, a 1998 Chevrolet Blazer with approximately 105,000 miles. In addition, the Debtor's apartment lease expires soon and she expects the rent to increase upon renewal.

### CONCLUSIONS OF LAW

Bankruptcy Code Section 707(b) governs dismissal or conversion of a case under Chapter 7. 11 U.S.C. § 707(b). This section was originally enacted by Congress to curb what it considered to be a growing number of Chapter 7 bankruptcies filed by dishonest or non-needy debtors. *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 or "BAPCPA" brought a "sea change" to this provision of the Bankruptcy Code. *Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1048 (9th Cir.2009). Formerly, there was a presumption in favor of granting relief to a Chapter 7 debtor and the section contained no specific language referencing the debtor's family size, assets, income, debts or other factors. *Id.; In re Sorrell*, 359 B.R. 167, 178–79 (Bankr. S.D.Ohio 2007). The presumption could only be overcome if, upon motion of the court or UST, the court determined that the granting of relief would be a "substantial abuse." *Sorrell*, 359 B.R. at 179.

BAPCPA modified § 707(b) by reversing the presumption that once favored granting relief to the debtor and eliminating the word "substantial" in front of abuse. *Id.* Section 707(b)(2)(A)(i) now creates a presumption of abuse for above median income debtors[8] when the debtor's current monthly income, reduced by allowed deductions and multiplied by 60, is equal to or greater than: (I) 25% of the nonpriority unsecured claims or $6,575, whichever is greater; or (II) $10,950.00. If the presumption of abuse does not arise pursuant to § 707(b)(2)(A)(i) or is rebutted,[9] the court is obligated to consider whether the case is nevertheless an abuse pursuant to § 707(b)(3) because either the petition was filed in bad faith or the "totality of the circumstances ... of the debtor's financial situation demonstrate abuse." In this case, the UST asserts that dismissal of the Debtor's case is warranted pursuant to either § 707(b)(2)(A)(i) or § 707(b)(3). The court will consider each argument separately.

### A. The Means Test and Presumption of Abuse Pursuant to § 707(b)(2): Payments on Debt Secured by Surrendered Property

■ Significant to the UST's first argument is how a debtor's allowed deductions or monthly expenses are to be calculated on the means test form to determine whether the presumption of abuse arises. Section 707(b)(2)(A)(iii)(I) allows a debtor a deduction for the "debtor's average monthly payments on account of secured debts" which are to be calculated as "the sum of ... the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition ... divided by 60."

As is often the case with provisions added by BAPCPA, this provision is ambiguous and courts have understandably come to differing conclusions as to whether it allows debtors to deduct monthly payments towards secured debt when the collateral has been or is to be surrendered in the bankruptcy case. *See In re Norwood–Hill,* 403 B.R. 905, 908–11 (Bankr.M.D.Fla. 2009) (describing the differing approaches to interpreting § 707(b)(2)(A)(iii)(I)). However, the Sixth Circuit Bankruptcy Appellate Panel[10] and bankruptcy judges in the Southern District of Ohio have espoused the majority view: that a debtor may deduct expenses on the means test form for payments on secured debt even when the collateral is surrendered as long as the debtor's continuing contractual obli-

---

8. Above median income debtors are those debtors whose current monthly income is above the median income for their household size in the state where they filed. *See* 11 U.S.C. § 707(b)(7). The presumption of abuse does not apply to below median income debtors. *Id.* The Debtor in this case is an above median income debtor.

9. The presumption of abuse arising under this provision can be rebutted by a debtor for certain "special circumstances" not asserted in this case. 11 U.S.C. § 707(b)(2)(B).

10. The Sixth Circuit Bankruptcy Appellate Panel addressed the propriety of this deduc-
tion on the means test in the context of a Chapter 13 case to determine "disposable income" as opposed to a Chapter 7 case to determine whether the presumption of abuse arises. *Hilderbrand v. Thomas (In re Thomas),* 395 B.R. 914 (6th Cir. BAP 2008). Nonetheless, the Bankruptcy Appellate Panel acknowledged that the deduction would be treated in the same manner in either type of case. *Id.* at 922 (clarifying that the means test is "a mechanical, formulaic approach that as applied is no different in chapter 7 than it is in chapter 13"). Consequently, the Bankruptcy Appellate Panel's determination is persuasive in both Chapter 7 and Chapter 13 cases.

gations remain unextinguished on the date of the bankruptcy filing. *See Hilderbrand v. Thomas (In re Thomas)*, 395 B.R. 914, 922 (6th Cir. BAP 2008); *In re Goble*, 401 B.R. 261, 270 (Bankr.S.D.Ohio 2009) (J. Hoffman); *In re Anderson*, 383 B.R. 699, 707–08 (Bankr.S.D.Ohio 2008) (J. Humphrey); *In re Graham*, 363 B.R. 844, 849 (Bankr.S.D.Ohio 2007) (J. Preston); *Sorrell*, 359 B.R. at 187 (J. Waldron). Generally, these courts interpret the plain language "scheduled as contractually due to secured creditors" to mean that a debtor may deduct secured debts that are contractually owed by the debtor to secured parties as of the petition date. *See, e.g., Anderson*, 383 B.R. at 706; *Sorrell*, 359 B.R. at 184–87. The courts "essentially take a snapshot of the debtor's schedules on the petition date" to calculate the secured debt deduction on the means test form. *Anderson*, 383 B.R. at 706.

■ There is case law that conversely supports disallowing means test deductions for secured debt payments on surrendered property. These courts take a "future oriented" approach to expenses, focus on the debtor's statement of intention rather than schedules, and adhere to the oft-cited goal of BAPCPA that debtors who can afford to pay their debts should do so. *See, e.g., In*

*re Burden*, 380 B.R. 194 (Bankr.W.D.Mo. 2007). However, this alternative deviates from the plain meaning of "scheduled as contractually due" in § 707(b)(2)(A)(iii)(I).[11] For this reason, the court follows the Sixth Circuit Bankruptcy Appellate Panel and other courts espousing the majority view and holds that the Debtor may deduct payments towards secured debts "scheduled as contractually due" as of the petition filing date [12] on the means test form even when the collateral has been or is to be surrendered in the bankruptcy case.

The court concludes that the Debtor's deductions on Lines 42(a), 42(b), and 43 [13] of the means test form for payments towards mortgages and real estate taxes on the Pittsfield property are appropriate. Consequently, the presumption of abuse does not arise in this case under § 707(b)(2).

## B. Determining Abuse Using the Totality of the Circumstances Test in § 707(b)(3): Treatment of Retirement Contributions and Loan Repayments

Alternatively, the UST asserts that the case should be dismissed pursuant to § 707(b)(3)(B) which provides:

judgment of foreclosure had been entered prepetition extinguishing the contractual terms between the debtor and creditor so that no amounts were "contractually due" as of the petition filing date. *See Goble*, 401 B.R. at 271 n. 8. In the instant case, the UST failed to demonstrate that the Debtor's contractual obligations to the mortgage holder had been extinguished prior to the bankruptcy filing.

**11.** The court rejects a third approach adopted in *In re Singletary*, 354 B.R. 455 (Bankr. S.D.Tex.2006) which permits the deduction for secured debt payments on property merely *intended* to be surrendered but prohibits the deduction for property that actually has been surrendered prior to the date the UST files its § 707(b) motion to dismiss. *Singletary*, 354 B.R. at 467. This approach relies on an arbitrary date beyond the petition filing date, i.e. the date the UST files its motion, for taking the "snapshot" of the debtor's secured debt to determine whether the presumption of abuse arises and conflicts with the approach adopted by the Sixth Circuit Bankruptcy Appellate Panel in *Thomas*.

**12.** The court agrees with dicta in the *Goble* decision that the result may be different if a

**13.** The real estate taxes owed on the Pittsfield property are also a proper deduction on Line 43 as a secured expense that would be necessary to pay in order to retain possession of the Pittsfield property. *See* 11 U.S.C. § 707(b)(2)(A)(iii)(II); *Goble*, 401 B.R. at 271–72.

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—

. . .

(B) [whether] the totality of the circumstances ... of the debtor's financial situation demonstrates abuse.

The language of this provision clarifies that, although an above median income debtor passes the means test under § 707(b)(2), the court may still find that the case constitutes an abuse pursuant to § 707(b)(3). *Goble*, 401 B.R. at 274 (noting that this section provides an above median income Chapter 7 debtor with a second gauntlet that must be run prior to allowing the case to proceed).

■ Under § 707(b)(3), the UST carries the burden of proving that the "totality of circumstances" of the Debtor's financial situation demonstrates that granting her a discharge would be an "abuse" of the provisions of Chapter 7. Prior to BAPCPA, the language of § 707(b) allowed courts to dismiss a case for "substantial abuse" but did not define what constituted a "substantial abuse" leaving it to the courts to define. *Id.* at 275. The Sixth Circuit, like other courts, has employed a two-part analysis, focusing in part on a debtor's honesty, but also requiring review of the "totality of the circumstances" to decide whether the debtor is non-needy. *Krohn*, 886 F.2d at 126. BAPCPA's adoption of the "totality of the circumstances" language in § 707(b)(3) is " 'best understood as a codification of pre-BAPCPA case law[.]' " *Goble*, 401 B.R. at 276 (quoting *In re Oot*, 368 B.R. 662, 665 (Bankr.N.D.Ohio 2007)). Thus, pre-BAPCPA case law remains instructive as to the factors to consider when reviewing the "totality of the

circumstances" and deciding whether to dismiss or convert a Chapter 7 case for abuse. *Id.; In re Schubert*, 384 B.R. 777, 780 (Bankr.S.D.Ohio 2008); *In re Stewart*, 383 B.R. 429, 432 (Bankr.N.D.Ohio 2008).

■ The seminal pre-BAPCPA cases in the Sixth Circuit addressing the "totality of the circumstances" test under former § 707(b) are *Krohn* and *In re Behlke*, 358 F.3d 429 (6th Cir.2004). They provide factors relevant to a court's consideration of whether a debtor's case should be dismissed for want of need. Of those factors, the most critical in determining the neediness of a debtor is whether the debtor has the ability to repay his debts out of future earnings. *Behlke*, 358 F.3d at 434; *Krohn*, 886 F.2d at 126 (noting that this "factor alone may be sufficient to warrant dismissal"). Other relevant factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Behlke*, 358 F.3d at 434 (quoting *Krohn*, 886 F.2d at 126–27).

■ In *Behlke*, the Sixth Circuit noted that one way courts determine a debtor's ability to pay is "to evaluate whether there would be sufficient disposable income to fund a Chapter 13 plan." 358 F.3d at 435. Post–BAPCPA, a similar "hypothetical Chapter 13" analysis has been adopted by many courts to determine abuse under § 707(b)(3). *Goble*, 401 B.R. at 276; *Stewart*, 383 B.R. at 432. The UST has applied the same analysis in this case.

■ Unlike the means test and its "snapshot" of secured debt expenses as of

the petition filing date, the determination of ability to pay is to be made at the time of the hearing. *Goble*, 401 B.R. at 276; *Schubert*, 384 B.R. at 780. Furthermore, in this jurisdiction, a debtor's funding of a Chapter 13 plan depends upon a calculation of the debtor's "projected disposable income" as derived from the debtor's Schedules I and J rather than the means test.[14] *Goble*, 401 B.R. at 277 (relying on *Hildebrand v. Petro (In re Petro)*, 395 B.R. 369, 378 (6th Cir. BAP 2008)). In this case, the Debtor argues that Schedules I and J, reflecting her income and expenses, demonstrate that she would have no leftover projected disposable income each month to pay towards her creditors in a Chapter 13 case. However, the Debtor testified at the hearing that her $82 monthly payroll deduction for life insurance, reflected on Schedule I, had been recently terminated and that her health care expenditures, reflected on Schedule J, should be reduced by approximately $50 per month. These changes alone create monthly projected disposable income of $132.

More important to the UST's argument are the significant funds deducted from the Debtor's paycheck each month for retirement related purposes: $436.11 towards a TSP loan repayment, $357.78 in TSP contributions, and $313.06 in contributions to a mandatory CSRS retirement plan. The UST argues that the Debtor's monthly TSP contribution is voluntary and that the Debtor already enjoys the mandatory retirement contribution to CSRS. By deleting the TSP contribution and loan

repayments, the Debtor would have an additional $794.00 each month to pay towards creditors in a Chapter 13 plan which, over five years, translates to a 67% repayment of unsecured creditors.

The UST cites pre-BAPCPA Sixth Circuit case law, including *Behlke* and *Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775 (6th Cir.1995), as support for the proposition that voluntary retirement contributions and repayment of retirement loans are not reasonable and necessary expenses for a Chapter 13 debtor. In *Harshbarger*, the Sixth Circuit concluded that a debtor's monthly payroll deduction of $61.17 used to repay an ERISA account loan must be treated as disposable income in the Chapter 13 bankruptcy case. 66 F.3d at 777. The court determined that it would be unfair to creditors to allow the debtor to commit part of her income to her own retirement fund while at the same time paying creditors less than a 100% dividend. *Id.* at 778. Likewise, in *Behlke*, the Sixth Circuit held that it was appropriate for a bankruptcy court to consider a debtor's ongoing voluntary contributions to a 401(k) account as disposable income when conducting the hypothetical Chapter 13 analysis under former § 707(b). 358 F.3d at 435–36.

The court agrees with the UST that these cases support the inclusion of voluntary retirement contributions and loan repayments in disposable income when conducting the hypothetical Chapter 13 analysis under § 707(b) as it existed prior to BAPCPA. However, the UST's argument fails to take into account the statu-

---

**14.** The Sixth Circuit Bankruptcy Appellate Panel concluded that "disposable income" in 11 U.S.C. § 1325(b)(2) and "projected disposable income" in 11 U.S.C. § 1325(b)(1)(B) are terms with different meanings and that it is the more forward looking "projected disposable income" that determines funding of a Chapter 13 case, an approach that conflicts with this court's prior decision in *Kolb*. Compare *Hildebrand v. Petro (In re Petro)*, 395 B.R. 369, 377–78 (6th Cir. BAP 2008) *with In re Kolb*, 366 B.R. 802, 818 (Bankr.S.D.Ohio 2007). With reservations, this court now follows the Sixth Circuit BAP decision in *Petro* which significantly impacts how this court conducts its hypothetical Chapter 13 analysis.

tory changes wrought by BAPCPA that substantially impacted the manner in which such retirement funding is now treated in Chapter 13 cases.

Following the enactment of BAPCPA, 11 U.S.C. § 1322(f) specifically excludes from § 1325(b)'s definition of "disposable income" amounts required to repay retirement account loans.[15] Courts view § 1322(f) as statutorily overruling the Sixth Circuit's decision in *Harshbarger*. *See Eisen v. Thompson*, 370 B.R. 762, 771 n. 14 (N.D.Ohio 2007); *In re Tucker*, 389 B.R. 535, 539 (Bankr.N.D.Ohio 2008). Similarly, 11 U.S.C. § 541(b)(7) now excludes from "disposable income" amounts withheld from wages as contributions to many types of retirement plans including the ERISA-qualified and government retirement plans specified in the language of the statute.[16] *In re Mravik*, 399 B.R. 202, 205 n. 2 (Bankr.E.D.Wis.2008); *Tucker*, 389 B.R. at 539. As one court has stated, "by excluding 401(k) contributions from property of the estate and expressly removing them from the definition of disposable income under section 1325(b), ... Congress has implemented a policy of protecting and encouraging retirement savings." *In re Mati*, 390 B.R. 11, 17 (Bankr. D.Mass.2008).

Because BAPCPA changed the treatment of retirement funds in Chapter 13 cases, it would appear that the parameters of any hypothetical Chapter 13 analysis under § 707(b)(3) would follow suit. However, many courts continue to consider those funds "disposable income" when determining ability to pay under § 707(b)(3). *See In re Pandl*, 407 B.R. 299, 302 (Bankr. S.D.Ohio 2009); *Tucker*, 389 B.R. 535; *In re Felske*, 385 B.R. 649 (Bankr.N.D.Ohio 2008). While recognizing BAPCPA's changed treatment of retirement funds, these courts generally reason that debtors wishing to reap the benefits of a Chapter 13 case and, more specifically, BAPCPA's favorable treatment of certain retirement funding and loan repayments, must first seek relief under Chapter 13 rather than Chapter 7. *See, e.g., Pandl*, 407 B.R. at 302; *Felske*, 385 B.R. at 658. Furthermore, these courts note that 401(k) loans are finite in length and that obligations on these loans may terminate naturally after full payment during the lifetime of a Chapter 13 plan freeing up funds for creditors. *Pandl*, 407 B.R. at 302; *Felske*, 385 B.R. at 658. Consequently, they include retirement contributions and loan repayment funds as money available to creditors when conducting a calculation of a debtor's ability to pay in what still amounts to a hypo-

**15.** Section 1322(f), added by BAPCPA, states: "A plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." 11 U.S.C. § 1322(f). Section 362(b)(19) covers loans from a 401(k) plan account, a thrift savings account and other types of retirement accounts. 11 U.S.C. § 362(b)(19).

**16.** Section 541(b)(7) states, in pertinent part:
(b) Property of the estate does not include—
(7) any amount—
(A) withheld by an employer from the wages of employees for payment as contributions—

(i) to—
(I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;
(II) a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or
(III) a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986; except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2)[.]

thetical Chapter 13 analysis (i.e. a determination of what unsecured creditors could be paid out of a debtor's disposable income over a period of three to five years). *Pandl*, 407 B.R. at 302–03; *Felske*, 385 B.R. at 658–59 (relying in part on the now overruled reasoning of *Harshbarger* that "it would be unfair to allow Debtors to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend").

■ This court respectfully disagrees with the *Felske* court and others adopting the same line of reasoning. When the basis for an attack on an individual's status as a Chapter 7 debtor is the ability to pay unsecured creditors in a hypothetical Chapter 13 case, it only makes sense that the analysis involve a realistic estimation of what the debtor would be required to pay in such a case under current law. The court does recognize the legitimate concern highlighted in *Felske* that a § 707(b)(3) analysis must take into consideration the longer term of a Chapter 13 case and the consequent prospective availability of funds based on certain post-confirmation events such as the natural termination of a loan obligation. However, accounting for the temporal distinction between Chapter 7 and Chapter 13 does not require adherence to the legal fiction that funds being contributed to a retirement plan and/or retirement loan repayment will be funds available to creditors in a Chapter 13 case. It merely requires a more thorough and future-looking review of a hypothetical Chapter 13 taking into account that those funds will become available only after the corresponding obligations are paid off in full. Consequently, if the Bankruptcy Code excludes certain retirement funds and loan repayments from a Chapter 13 debtor's "disposable income," thereby protecting those funds from payment to unsecured creditors, the court can see no logical basis for including those funds in "disposable income" when conducting a hypothetical Chapter 13 analysis under § 707(b)(3).

The same point was highlighted in *In re Latone*, 2008 WL 5049460 (Bankr.D.Ariz. October 23, 2008). In *Latone*, the UST filed a motion to dismiss a below median income Chapter 7 debtor's case under § 707(b)(3) for abuse. *Id.* at *1. The only basis for the motion was the debtor's monthly payroll deduction for repayment of various 401(k) loans. *Id.* at *2. The UST argued that if the continuing loan repayments were considered "disposable income" available to creditors in a hypothetical Chapter 13 case, the debtor would have $1,518 per month or possibly as much as $91,080 over the life of a Chapter 13 plan to pay creditors. *Id.* Noting BAPCPA's changes to § 1322(f) excluding 401(k) loan repayments funds from the definition of "disposable income," the court determined that "[i]f the Debtor converted his case to a Chapter 13, the very amounts the U.S. Trustee argues could be used to fund the hypothetical 13 plan, would be excluded from a disposable income calculation and could not be used to fund the Chapter 13 plan." *Id.* When analyzing a debtor's ability to repay debts in a Chapter 13 case, the court stated "that ability must be real." *Id.* at *3. Consequently, if a debtor's excess funds could not be used to fund a Chapter 13 plan, the debtor's filing of a Chapter 7 case is not an abuse. *Id.*

This court concurs with *Latone* that it would be pointless to either dismiss a Chapter 7 case when a debtor could refile under Chapter 13, or convert the case directly to Chapter 13 if such action would not result in any additional funds being repaid to unsecured creditors. *Id. See also In re Salerno*, 408 B.R. 554, 558 (Bankr.D.Conn.2009); *In re Le Roy*, 2009

WL 357923, at *3 (Bankr.E.D.Wis. Feb.12, 2009); *In re Skvorecz*, 369 B.R. 638, 643–44 (Bankr.D.Colo.2007) (reaching a conclusion similar to *Latone* that requiring either dismissal or conversion under § 707(b) was absurd if the only result would be a Chapter 13 case paying unsecured creditors nothing); *In re Lenton*, 358 B.R. 651, 664 (Bankr.E.D.Pa.2006) (excluding from disposable income 401(k) contributions and loan repayments that would be "untouchable" in a Chapter 13 plan). In such circumstances, a debtor has no more "ability" to pay unsecured creditors in a Chapter 13 case than one under Chapter 7 and, consequently, that debtor's Chapter 7 case would not constitute an abuse on this basis.

For these reasons, the court rejects the UST's argument that the $357.78 in monthly contributions to the Debtor's TSP account and $436.11 towards repayment of two TSP loans should be included in the calculation of funds available to creditors in a hypothetical Chapter 13 case. Because these funds would be excluded from

"disposable income" [17] in an actual Chapter 13 case, the court will afford the funds the same treatment in a hypothetical Chapter 13 analysis conducted under § 707(b)(3). [18]

■ However, the hypothetical Chapter 13 analysis does not end here. In those jurisdictions that interpret "projected disposable income" as a more discretionary and future-oriented concept, the court must examine the record and account for funds that may become available to creditors sometime during the term of a Chapter 13 plan. Given the inherent unreliability of any prediction of future events, this analysis must be solidly grounded in reality and objective evidence. In this case, the court must take into consideration that the TSP loans are finite and that both TSP loans would be paid off within the lifetime of a five-year Chapter 13 plan. Clearly, the funds presently directed to repayment of the loans could be dedicated to pay creditors in future months once the loans are paid off.

■ The court is able to determine the availability and amount of these funds with

---

17. By determining that "projected disposable income" and "disposable income" have different meanings in the Bankruptcy Code, the Sixth Circuit Bankruptcy Appellate Panel's *Petro* decision leaves some questions unanswered including whether § 541(b)(7) and § 1322(f)'s exclusion of certain retirement contributions and loan repayments from "disposable income" translates into an exclusion from "projected disposable income" and plan payments in a Chapter 13 case. Nonetheless, this court believes that Congress intended to protect those funds from creditors in a Chapter 13 case and, thus, those funds are not to be included in a calculation of either "disposable income" or "projected disposable income" when determining what funds are available to pay creditors. However, because "projected disposable income" is a forward looking concept that considers post-petition changes in a debtor's income and expenses, the court may take into consideration the payoff dates on retirement loans.

18. The court recognizes that neither the language of § 707(b)(3) nor the pre-BAPCPA case law that continues to guide the "totality of the circumstances" test mandates the use of a hypothetical Chapter 13 analysis as the only way to determine abuse. The Sixth Circuit and other courts have often looked at additional factors such as the stability of the debtor's income, the existence of state law remedies that could ease a debtor's financial predicament, and whether the bankruptcy was the result of an unforeseen catastrophic event. *See Behlke*, 358 F.3d at 434, 437. It is important to note that in this case, a hypothetical Chapter 13 analysis was the nearly exclusive focus of the UST. No evidence was introduced to show that the Debtor might have been able to pay more to her creditors under state law procedures or that some other circumstance might enhance her ability to pay her creditors. Because the UST bears the burden of proof on these issues, the court must assume that no such circumstances exist. *Tucker*, 389 B.R. at 541.

a reasonable degree of certainty based upon the Debtor's testimony. At the hearing, the Debtor testified that one of her TSP loans will be paid in full in seven months freeing $100 per month to pay towards creditors. The second loan, to which the Debtor directs $336.11 a month, will be paid off in 36 months freeing those funds to be paid to creditors in the remaining 24 months of a plan. The court calculates that the termination of those loan payments will make a total of $13,366 [19] available to creditors over the life of a five year plan. When this amount is added to the $132 of monthly projected disposable income that the Debtor has because of the termination of her life insurance and overstatement of her healthcare expenses, the Debtor should be able to pay a total of $21,286.00 [20] into a Chapter 13 plan over five years resulting in an approximately 30% dividend to unsecured creditors.[21] While this dividend may be reduced by fees paid to a Chapter 13 trustee and an attorney, this amount still represents a meaningful distribution to creditors.[22] *See Behlke*, 358 F.3d at 437–38 (concluding that a Chapter 7 case constituted a substantial abuse when debtors could pay between 14% and 23% of their unsecured debts in a Chapter 13 case); *In re Mestemaker*, 359 B.R. 849, 857 (Bankr.N.D.Ohio 2007) (finding an abuse when a debtor could pay 10% to 15% of all unsecured debt in a Chapter 13 case).

The facts of this case demonstrate that the Debtor enjoys a relatively high and stable income which would allow her to pay her creditors a significant dividend in a Chapter 13 case while paying her necessary expenses and continuing to contribute to two separate retirement accounts and to repay two retirement loans. Pursuant to § 707(b)(3), the court concludes that the Debtor's Chapter 7 case represents an abuse and the result compels the court to dismiss the case unless the Debtor voluntarily converts it to one under Chapter 13 within twenty (20) days of the date of the entry of this decision and the related order.

**SO ORDERED.**

19. Because the first TSP loan will be paid off in seven months, the Debtor would have an extra $100 to pay into a plan for the remaining 53 months which provides $5,300 in disposable income over the life of the plan. The second loan will be paid off in 36 months leaving the Debtor with an additional $336.11 for the remaining 24 months or $8,066 in disposable income over the life of the plan.

20. The court calculates the total payments over the life of the five year plan to be [ ($132 × 60) + $5,300 + $8,066] which totals $21,286.00.

21. The dividend is calculated based on the $71,378.00 in general unsecured debts scheduled by the Debtor.

22. The Debtor also testified that she has an older vehicle which may be replaced in the near future and that she may experience an increase in her apartment rental expense. However, no evidence was provided on when the replacement of the vehicle may occur nor did the Debtor quantify how either event would impact her monthly expenses. Consequently, these potential future expenses are too speculative to be included in the hypothetical Chapter 13 calculation. *See Lenton*, 358 B.R. at 665–66 (noting that speculation that a debtor will have higher transportation costs when the case converts to Chapter 13 because of the potential need to replace an older vehicle does not impact the § 707(b)(3) analysis; the debtor should be required to convert to Chapter 13 at which point he will be given appropriate credit for his vehicle expenses when there are actually determined).