ELECTRONIC CITATION:  13 FED App.0003P (6th Cir.)
File Name:  13b0003p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re:  STEVEN J. WEIXEL<br>        ANN M. WEIXEL,<br><br>                Debtors. | )<br>)<br>)   No. 12-8047<br>) |

_____

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio
No. 12-11313

Submitted: May 14, 2013

Decided and Filed: June 28, 2013

Before: HUMPHREY, McIVOR AND PRESTON, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

ON BRIEF: Stephen D. Hobt, Cleveland, Ohio, for Appellants.  Amy L. Good, Linda Battisti, UNITED STATES DEPARTMENT OF JUSTICE, Cleveland, Ohio, for Appellee.

_____

**OPINION**
_____


**GUY R. HUMPHREY**, Bankruptcy Appellate Panel Judge.  In this appeal, the debtors, Steven J. Weixel and Ann M. Weixel (the "Weixels"), appeal the bankruptcy court's order dismissing their Chapter 7 case as an abuse under 11 U.S.C. § 707(b)(1) and (3).  For the reasons stated in this opinion, the Panel determines that the bankruptcy court's order should be affirmed.

1

## I.   ISSUE ON APPEAL

The issue on appeal is whether the bankruptcy court erred in determining the totality of the circumstances of the Weixels' financial situation demonstrated abuse pursuant to 11 U.S.C. § 707(b)(3) and required dismissal of the Weixels' Chapter 7 case pursuant to § 707(b)(1). Specifically, the Weixels argue that the bankruptcy court failed to consider the Weixels' scheduled priority tax debt and their household's future housing expense in determining their Chapter 7 case was an abuse.

## II.   JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Northern District of Ohio has authorized appeals to the Panel, and no party has timely elected to have this appeal heard by the district court.  28 U.S.C. §§ 158(b)(6), (c)(1).  A bankruptcy court's final order may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1).  For purposes of appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citation and quotation marks omitted).  An order dismissing a bankruptcy case is a final order.  *In re Anderson*, 397 B.R. 363, 365 (B.A.P. 6th Cir. 2008).

"[T]he ultimate question of whether to dismiss" a case for abuse under § 707(b) is reviewed for an abuse of discretion because it is an equitable determination.  *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004).  *See Mayor of Baltimore v. W. Va. (In re Eagle Picher Indus., Inc.)*, 285 F.3d 522, 527 (6th Cir. 2002) (equitable determinations are subject to an abuse of discretion standard). "An abuse of discretion is defined as a 'definite and firm conviction that the [court below] committed a clear error of judgment.' "  *Id.* at 529.  The particular factual findings of the bankruptcy court are reviewed for "clear error."  *Behlke*, 358 F.3d at 433.  *See also* Fed. R. Bankr. P. 8013 (findings of fact are reviewed under a clearly erroneous standard).

## III.  FACTS

*A.      The Weixels' Chapter 7 Filing, Schedules, Income, Expenses and Debts*

The Weixels filed a Chapter 7 petition on February 26, 2012.  The Weixels were not eligible for relief under Chapter 13 of the Bankruptcy Code due to the amount of their debt.[1]  Their Schedule I shows five minor children included in their household.

Mr. Weixel is employed as a loan officer at Howard Hanna Mortgage Services.  From 2002 until 2008, Mr. Weixel owned a mortgage brokerage company called ABC Mortgage Corporation ("ABC").  From the time ABC was formed in 2002 until 2006 the business expanded, but due to the housing crisis ABC is now defunct.  Mr. Weixel's overall income has declined in recent years, stabilized, and recently has shown signs that it may be increasing.  The exact figures are unavailable, in part because the Weixels did not file with the Internal Revenue Service (the "IRS") all their required pre-petition tax returns and also because they did not produce to the United States Trustee (the "UST") all the tax returns they did file with the IRS.  On Schedule J, his monthly net income is listed at $7,382, which would be $88,584 a year.  Mr. Weixel's gross income was between $185,000 and $200,000 in 2005 and peaked at approximately $200,000.  In 2010 Mr. Weixel's gross income was reduced to approximately $110,000 and by 2011 his gross income was $51,986.

For about five years prior to filing bankruptcy, Ms. Weixel operated her own business through a limited liability company, The Ride and Workout, which she described as a "high-end exercise studio."  [Hr'g Tr., p. 63].  Her scheduled income was the average gross receipts from the business, which appears to have been fairly stable in recent years and perhaps increasing.  The 2008 through 2011 business net income was $54,462, $47,441, $55,364 and $62,941, respectively.  The

---

[1]At the time that the Weixels filed their petition, to be eligible to file a Chapter 13 case, each debtor's noncontingent, liquidated, unsecured debt could not exceed $360,475 and each debtor's noncontingent, liquidated, secured debt could not exceed $1,081,400.  11 U.S.C. § 109(e).  The total of their scheduled unsecured debt on Schedule F was only $85,143, but the total of their scheduled secured debt on Schedule D of $1,101,625 was above the statutory cap.

parties agreed that, after taxes, Ms. Weixel's business income contributed about $3,000 each month to the household's income.[2]

The Weixels' combined adjusted gross income stated on their 2011 federal income tax return was $114,927. Schedule I showed an average monthly take home pay of $20,915, although the true figure is less due to Ms. Weixel's business expenses not having been deducted to arrive at that number. After deducting Ms. Weixel's business expenses, the Weixels' household monthly take-home income reflected on Schedule I is $10,395 [$20,915 (Schedule I line 16) − $10,519 (Schedule J line l6)], or over $120,000 each year.

The Weixels' expenses listed on Schedule J include a self-described "reasonable" expense of $3,500 for future housing because the Weixels were not making the monthly mortgage payment on their residence when the case was filed, which was about $5,500 each month.[3] In addition, Schedule J did not list any suggested expense figure for repaying delinquent income taxes, which according to Schedule E, totaled $240,000.[4] The business expenses for The Ride and Workout are separately itemized in an attachment to Schedule J. After expenses, Schedule J showed the Weixels had a de minimus monthly net income of $9.

The Weixels scheduled $1,426,768 in total liabilities. Those liabilities included three mortgage loans on their residence totaling $829,020; a secured automobile loan in the amount of $6,016; statutory tax liens; and a judgment lien against their residence. The total of the scheduled

---

[2] The average monthly income of $13,353 for Ms. Weixel on Schedule I is not correct because that figure reflects her monthly business gross income and should reflect her monthly net income, based upon the separate itemization of the expenses deducted. Schedule J reflects that she had monthly business expenses in the amount of $10,519.

[3] Mr. Weixel testified that the mortgage payment was $5,500; however, Schedule J reflects the payment as being $5,216. All the figures from the record that include fractions of a dollar are rounded to the nearest dollar.

[4] Schedule E reflects that the Weixels owe the following income taxes entitled to priority treatment under the Bankruptcy Code for the following periods: a) IRS − $180,000 for 2007 - 2010; b) the state of Ohio − $50,000 for 2003 - 2011; and c) $10,000 for what appears to be city taxes for 2003 through 2011. The Weixels provided their 2011 tax returns to the UST, but were requested by the UST to supply tax returns since 2006. According to Mr. Weixel, some unspecified tax returns for that period were filed but not provided to the UST, but other returns were not filed at all.

4

secured debt is $1,101,625. As noted, the Weixels scheduled $240,000 in priority unsecured tax debt. The non-priority unsecured debt is $85,143.

B.    *Weixels' Lifestyle*

In the Spring of 2006 the Weixels purchased for $590,000 a 3,300 square foot residence at 20922 Avalon Drive in Rocky River, Ohio, with a limited view of Lake Erie, and no money down. They refinanced the loan, borrowing an additional $50,000 against the home and used some of those funds for improvements to the home. Due to their financial circumstances, the Weixels stopped making the mortgage payments by 2009 and filed their bankruptcy petition on February 26, 2012 – the day before the sheriff sale was scheduled. As of the time of the hearing on the UST's motion to dismiss, the Weixels had not moved because a foreclosure sale was not imminent.

Mr. Weixel plays poker. He mostly plays in a local league with a $50 entry fee every other weekend for a total of $1,300 each year, but also has played in casino tournaments in Las Vegas and Atlantic City. Mr. Weixel's losses are capped for these tournaments at his entry fee and he claimed his winnings allowed him to "break even," but he had no specific records to support this assertion. [Hr'g Tr., p. 36]. On two occasions, those being in 2005 and 2007, Mr. Weixel spent $1,500 to enter a poker tournament. Mr. Weixel won $20,000 between 2008 and 2010, but spent those funds on entry fees and "potentially any other expenses with the family." [Hr'g Tr., p. 58]. The Weixels' bank statements reveal travel and other expenses related to his gambling.[5]

_____

[5]In September 2011 Mr. Weixel stayed at a casino hotel in Atlantic City and withdrew $500 from a bank account. On September 15, 2011 another $500 was withdrawn through an ATM at the casino hotel. On September 16, 2011 Mr. Weixel made a purchase on his debit card for $1,067. On December 15, 2011 Mr. Weixel withdrew $403 from a race track in Erie, Pennsylvania. On December 23, 2011 Mr. Weixel made a debit card purchase for $67 in Las Vegas, but he testified he was not there to gamble. On January 24, 2012 Mr. Weixel made a $186 debit card purchase at the Golden Nugget, a Las Vegas casino. Mr. Weixel stated that the Golden Nugget visit was a complimentary attendance for a poker camp hosted by professional poker players. On January 25, 2012 Mr. Weixel made a $20 purchase through an internet poker web site. On April 16, 2012, after the petition was filed, Mr. Weixel spent $99 at a race track and had two separate $200 ATM withdrawals that same day. On May 11, 2012 Mr. Weixel was at the Horseshoe Casino in Cleveland, Ohio. Between June 15 - 18, 2012 Mr. Weixel was back in Atlantic City. Mr. Weixel testified that some of his travel expenses were paid by the poker tournaments. Schedule J does not directly reference these expenses. The Weixels list $250 each month for entertainment, but it appears Mr. Weixel did not consider poker an entertainment expense based on his position that his winnings essentially paid for the hobby.

5

The UST also introduced other evidence as to the Weixels' unnecessary spending both prior to and following the filing of the bankruptcy petition.[6]

C.    *The United States Trustee's Evidence*

The UST moved to dismiss this case pursuant to 11 U.S.C. § 707(b)(1), (2) and (3). At issue before this court is whether the bankruptcy court erred in granting the UST's motion to dismiss under § 707(b)(1) for abuse of Chapter 7 of the Bankruptcy Code based upon the totality of the circumstances of the Weixels' financial situation as provided for by subsection (b)(3).

The Weixels and John Weaver, a bankruptcy analyst for the UST, testified at the hearing on the motion to dismiss. The majority of the Weixels' evidence was presented through Mr. Weixel's testimony, with Ms. Weixel's testimony being limited to the income derived from her business.

The UST reviewed the Weixels' bank statements and questioned various entertainment expenses of the Weixels. The bank statements show that at a time when the Weixels' bank account had been repeatedly overdrawn, the Weixels continued to spend funds on entertainment.

The UST concluded that the Weixels, with appropriate budget adjustments, had monthly disposable income of $2,308. Rather than the $3,500 hypothetical figure for housing used by the Weixels, the UST chose the applicable means test housing allowance of $1,195. This significant change reduced the Weixels' overall expenses by $2,305. Following the same procedure, the UST made smaller adjustments for other housing expenses, personal expenses [food, clothing, laundry and recreation], and automobile expenses. The UST added $1,000 to pay the scheduled priority

---

[6]The Weixels' bank statements were specifically addressed at the hearing. As examples, shortly after the Chapter 7 was filed, the Weixels' bank account shows $36 spent on a restaurant on March 19, 2012 and $63 spent at a different restaurant that same day. On April 16, 2012 the Weixels spent $63 on another restaurant. On April 19, 2012 another $78 was spent on a restaurant. Two other restaurant expenses for $50 are shown for April 23, 2012. The day of the Weixels' financial education course they spent $41 at a wine bar and withdrew another $100 through an ATM. Mr. Weixel could not explain or document any of the specific ATM withdrawals, but stated many of them were for ordinary expenses.

6

unsecured taxes, which were given a $4,000 credit under the means test [$240,000 / 60].[7]  Except for the delinquent taxes, the UST used the statutory "means test" expenses in determining ability to pay.

## IV.  ANALYSIS AND DISCUSSION

A.        *Statement of the Law*

Section 707(b) was added to the Bankruptcy Code in 1984 with other amendments intended to address consumer credit and was "more than a needless duplication of the 'other provisions of the Code that have always required petitioners to file in good faith.' "  *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989) (quoting *In re Walton*, 866 F.2d 981, 983 (8th Cir. 1989)).  Section 707(b)(1) states that "[a]fter notice and a hearing, the court, on its own motion or on a motion by the United States trustee . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter."  11 U.S.C. § 707(b)(1).  When the UST moves to dismiss a case under § 707(b), it has the burden of proving abuse by a preponderance of the evidence.  *In re Kehl*, 463 B.R. 18, 21 (Bankr. E.D. Mich. 2011) (citing *In re Beckerman*, 381 B.R. 841, 844 (Bankr. E.D. Mich. 2008)).

In Congress's most recent significant amendment of the Bankruptcy Code, it made three notable changes to § 707(b).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"):  1) changed the former standard of "substantial abuse" to a lesser standard of "abuse;" 2) eliminated the presumption in favor of granting bankruptcy relief to debtors; and 3) added a "means test" to Chapter 7 through § 707(b)(2) which creates a statutory presumption of abuse if a debtor has a defined minimal "current monthly income" remaining after the deduction of certain allowed expenses.  These changes reflect Congress's intent to limit the availability of Chapter 7 bankruptcy relief to those deserving of a fresh start.

---

[7]11 U.S.C. § 707(b)(2)(A)(iv) ("The debtor's expenses for payment of all priority claims  . . . shall be calculated as the total amount of debts entitled to priority, divided by 60.").

While much of the focus following the enactment of BAPCPA has related to the mechanical application of the means test, even if the calculated presumption of abuse provided for by § 707(b)(2) does not arise or is rebutted, a debtor's chapter 7 case may still be found to be abusive under § 707(b)(3). *Schulz v. United States*, 529 F. 3d 343, 348 (6th Cir. 2008)*; In re Mestemaker*, 359 B.R. 849, 855 (Bankr. N.D. Ohio 2007). Section 707(b)(3) states, in relevant part, that "[i]n considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider . . . (A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3). Although BAPCPA changed the standard of substantial abuse to abuse and eliminated the presumption in favor of the debtor being granted relief, § 707(b)(3) otherwise essentially codifies the principles of pre-BAPCPA case law concerning § 707(b). *In re Goble,* 401 B.R. 261, 276 (Bankr. S.D. Ohio 2009) (totality of the circumstances test codifies case law prior to BAPCPA (citing *In re Oot*, 368 B.R. 662, 665 (Bankr. N.D. Ohio 2007)).

In the Sixth Circuit, the two seminal § 707(b) cases are *Krohn*, 886 F.2d 123 and *Behlke*, 358 F.3d 429. The *Behlke* decision reaffirms the principles of *Krohn. Behlke,* 358 F.3d at 433-36. In *Krohn* the Sixth Circuit determined that Congress sought to curb "substantial abuse" by denying Chapter 7 relief to the dishonest or non-needy debtors. *Krohn,* 886 F.2d at 126 (citing *In re Walton*, 866 F.2d 981, 983 (8th Cir. 1989)). Thus, a finding of abuse under the totality of the circumstances test provided by § 707(b)(3)(B) can be predicated upon either lack of honesty, want of need or both. *Beckerman*, 381 B.R. at 844-45. The factors outlined in *Krohn* for assessing the debtor's honesty and need for bankruptcy relief combine to serve as the framework for determining the totality of the circumstances of the debtor's financial situation. *See In re Schubert*, 384 B.R. 777, 780 (Bankr. S.D. Ohio 2008) (listing the combined factors).

An honest debtor is one whose "relationship with his creditors has been marked by essentially honorable and undeceptive dealings." *Krohn,* 886 F.2d at 126. Factors that may be relevant to ascertaining a debtor's honesty include the debtor's forthrightness in preparing and filing his schedules and other documents, whether he has made substantial purchases on the eve of

8

bankruptcy, and whether the Chapter 7 filing was caused by unforeseen or catastrophic events. *Id.* The court's summary of the purpose of § 707(b) sheds light on the "honesty" element of § 707(b):

> In essence, § 707(b) allows a bankruptcy court to deal equitably with the unusual situation where an unscrupulous debtor seeks to enlist the court's assistance in a scheme to take unfair advantage of his creditors; it serves notice upon those tempted by unprincipled accumulation of consumer debt that they will be held to at least a rudimentary standard of fair play and honorable dealing.

*Id.* The spectrum of debtors that fall into the "dishonest" category described by *Krohn* covers a broader swath than what may be typically envisioned as dishonest people, sweeping in those debtors who seek to take unfair advantage of their creditors, including through the discharge of unbridled accumulation of consumer debt. *See Schubert*, 384 B.R. 777; *In re Ragan*, 171 B.R. 592 (Bankr. N.D. Ohio 1994) (pre-BAPCPA);[8] and *In re Barnes*, 158 B.R. 105 (Bankr. W.D. Tenn. 1993) (pre-BAPCPA) (all standing for the proposition that a debtor living beyond his means and refusing to adjust his budget and change his lifestyle support dismissal for abuse under § 707(b)(3)).

A "needy" debtor is one whose "financial predicament warrants the discharge of his debts in exchange for liquidation of his assets." *Krohn*, 886 F.2d at 126. In determining whether the debtor is "needy" the court may consider whether the debtor can repay his debts out of future earnings. *Id.* "Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 . . . , whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities."[9] *Id.* at 126-27.

---

[8] "Debtor's acts within the two (2) years preceding the filing of his Petition of incurring debts which he could not afford to repay but for his retirement income, exhibit bad faith in filing of the Petition and constitute 'lack of honesty' which is tantamount to the substantial abuse requirement of Section 707(b)." *Ragan*, 171 B.R. at 595.

[9] Although the Weixels are ineligible for Chapter 13, their ineligibility is not dispositive and the court may consider other factors to determine neediness. *Krohn*, 886 F.2d at 127.

*B.*     *The Bankruptcy Court's Decision*

At the conclusion of the hearing, the bankruptcy court ruled that, due to the Weixels' tax debt, the presumption of abuse did not arise pursuant to § 707(b)(2), a determination that the UST has not appealed, and deferred ruling on the § 707(b)(3) dismissal request. In an oral decision presented subsequent to the day of the hearing, the bankruptcy court ruled that, under the totality of the circumstances, the Weixels' case should be dismissed for abuse pursuant to § 707(b)(1) and (3).

The UST did not pursue the bad faith prong of § 707(b)(3)(A) and the court's determination was solely based upon § 707(b)(3)(B). Dismissal of cases for bad faith have been limited to the most "egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Indus. Ins. Servs., Inc. v. Zick* (*In re Zick*), 931 F.2d 1124, 1129 (6th Cir. 1991) (analyzing bad faith as establishing cause under § 707(a)). Accordingly, the analysis of the bankruptcy court's decision will be limited to the grounds stated under § 707(b)(3)(B) – whether the totality of the circumstances of the debtors' financial situation demonstrates abuse. The bankruptcy court's review of the totality of the debtors' circumstances is to be conducted based upon the debtors' circumstances as of the time of the hearing. *Schubert*, 384 B.R. at 780 (citing *In re Pennington*, 348 B.R. 647, 651 (Bankr. D. Del. 2006)).

The bankruptcy court primarily addressed the economic realities of the Weixels' situation in her oral decision. The court noted that while Mr. Weixel's income had decreased over time, Ms. Weixel's business income was stable or increasing. Another factor relied upon by the bankruptcy court was the Weixels' decisions to purchase a $590,000 house with 100% financing and to borrow an additional $50,000 through a subsequent refinancing. The bankruptcy court analyzed the economic effects of Mr. Weixel's poker hobby, but emphasized that the court was not making a value judgment as to poker as a hobby. In particular, the court assessed the expenses attendant to the hobby and how winnings were used when the Weixels' finances were in distress. The court found that between 2008 and 2010 Mr. Weixel won about $20,000, but used some of those funds for additional poker entrance fees instead of necessities. The court was also concerned about the

10

travel expenses involved in attending poker tournaments. The court referenced other unnecessary travel and dining expenses reflected on the bank statements and concluded generally that the Weixels appeared to have made no adjustment to their lifestyle despite their economic distress. The court left open the possibility that a subsequent Chapter 7 case could work if the Weixels' financial situation had changed.

C.      *Analysis of the Bankruptcy Court's Decision*

The record supports the bankruptcy court's decision. The Weixels, despite being in financial difficulty since 2007, made no attempt to change their upscale lifestyle.

The most visible example of their lifestyle was their residence. Rather than vacate the residence, move to a more affordable residence, and adjust to a new lifestyle, the Weixels chose instead to cease paying upon the mortgage loan, reside in the residence at the lender's expense, and wait for a foreclosure. The Weixels ceased making payments on the house by November 2009 and filed their bankruptcy petition on February 26, 2012, the day before the rescheduled foreclosure sale.

The Weixels' avoidance of belt-tightening is also exhibited through their recreational habits. Rather than eliminate his poker travels or use his poker winnings to pay some of his delinquent taxes or other necessities, Mr. Weixel chose to use some of those winnings for expenses to continue his poker hobby. The Weixels have continued to expend funds by eating at restaurants, and Mr. Weixel traveled unnecessarily to play poker. The evidence supports the trial court's finding that the Weixels failed to adjust their upscale lifestyle despite their financial circumstances.

The accumulation of significant consumer debt, including the purchase of a $590,000 residence with 100% of it financed, followed by the borrowing of an additional $50,000, the failure to file their tax returns and pay income taxes for multiple years, and the lack of any unforeseen or catastrophic event leading to the bankruptcy are all factors that support the "dishonest" debtor element of *Krohn*. Even assuming that the downturn in the real estate market was not foreseeable, the downturn does not explain or justify the extent of the risk in which the Weixels engaged by leveraging their residence or their failure to adjust their lifestyle by finding more affordable housing

11

and reducing other expenses once the housing collapse occurred. They were able to maintain their upscale lifestyle by remaining in their house and not paying their mortgage payments and tax obligations.

The Weixels argue that the bankruptcy court failed to consider their future housing expense and the payments that they will have to make to the taxing authorities in determining that their filing constituted an abuse under Chapter 7. The fallacy of this argument is that it focuses on the "needy" element of the § 707(b)(3) analysis, while side-stepping the "honesty" element of the totality of the circumstances test. *Krohn* teaches that need is not the sole consideration in determining whether a debtor seeks to abuse Chapter 7 – but rather that the need for bankruptcy relief based upon unprincipled accumulation of consumer debt may also constitute abuse. Moreover, in considering the Weixels' housing expense, the bankruptcy court did not err in its "needs" analysis. The court specifically found the Weixels' current housing was too expensive and the Weixels presented no evidence to support the $3,500 figure for housing. The bankruptcy court found that after the residence was sold and other changes were made, it was possible that the Weixels could be eligible for Chapter 7 relief. The Weixels never explained why they should be entitled to a housing expense almost three times the standard means test allowance. The bankruptcy court was entitled to consider the means test figure used by the UST as the more reasonable figure. In any event, the Weixels effectively waived this particular position. At the closing argument, after never disputing the UST's housing figure during the hearing, Weixels' counsel stated that, with the exception of the priority taxes, the Weixels "adopted the U.S. Trustee's analysis of our expenses." [Hr'g Tr., p. 75].

The bankruptcy court also did not err in failing to consider the $240,000 in scheduled priority taxes as the Weixels argue. There are a number of flaws in the Weixels' position. First, the Weixels never proposed how they would pay the tax debt or budget it as an expense. The UST used a $1,000 monthly figure for the repayment of these obligations in assessing the Weixels' disposable income. The Weixels argued at the hearing that the figure should be $4,000 based upon the means test formula. But a § 707(b)(3) analysis is not limited to using specific figures from the means test calculation of § 707(b)(2), including the scheduled priority tax debt, but is an overall analysis of the totality of the Weixels' financial condition. *In re Booker*, 399 B.R. 662, 666-67 (Bankr. W.D. Mo. 2009). Second, it is not clear how much the Weixels owe in back taxes or how their tax liabilities

might be compromised in the future. Mr. Weixel conceded that the Weixels did not file all their pre-petition tax returns nor did they provide all their filed returns to the UST. Having not even filed all the required returns and having made no effort to compromise these scheduled debts, the bankruptcy court was entitled to conclude that the Weixels cannot rely on the $240,000 figure to assert that they lack disposable income because those same taxes need to be repaid. Disposable income is independently determined by the court and is not dependent on the financial figures provided by the Weixels. *In re Brenneman*, 397 B.R. 866, 871 (Bankr. N.D. Ohio 2008) (citing *In re Gonzalez*, 378 B.R. 168, 173 (Bankr. N.D. Ohio 2007)). Third, although the bankruptcy court did not specifically refer to the taxes in her oral ruling, the record demonstrates she was well aware of the issue and even questioned Mr. Weaver about it during the hearing. Under the circumstances, the bankruptcy court was entitled to decide what weight to give the limited evidence available concerning the tax debt.

Overall, the record shows that the Weixels made no attempt to adjust their lifestyle over several years to address a house they could not afford and income taxes they were not paying. Mr. Weixel continued his poker playing, and the evidence supported the bankruptcy judge's conclusion that this pursuit did not pay for itself. The Weixels continued to spend an inappropriate amount of funds on entertainment in the midst of their financial crisis.[10] The Weixels have not completed and filed all their tax returns in order to explore with the federal, state, and local tax agencies to what extent their tax debt could be compromised. The Weixels' financial history shows that these taxing agencies were conveniently used as "the lender of last resort."

Finally, despite financial hardships, the Weixels' income is significantly higher than the median income for their household size.[11] This potential future income available to the Weixels weighs in favor of dismissal. *Brenneman*, 397 B.R. at 871; *In re Peterlin,* 457 B.R. 630, 634 (Bankr. N.D. Ohio 2011) ("A substantial level of income weighs in favor of abuse.").

---

[10] Mr. Weixel testified that some unspecified portion of the entertainment expenses constituted business expenses, but he provided no documentation and indicated he failed to deduct these expenses on the Weixels' tax returns.

[11] On their Official Form B22A, the Weixels listed the applicable median family income for their household size as $93,099.

**V. CONCLUSION**

This Panel has no scale to measure the difference between "substantial abuse" and "abuse" of Chapter 7. However, BAPCPA's relaxing of that standard and elimination of the presumption in favor of relief being granted to the debtor expressed Congress's intent that bankruptcy courts be given more latitude to deny Chapter 7 relief based upon the totality of a debtor's financial situation. The bankruptcy court concluded that the totality of the Weixels' financial condition warranted a dismissal of this case. Having reviewed the record in its entirety, this court does not have a definite and firm conviction that the bankruptcy court erred in determining that the UST met his burden to show that the totality of the Weixels' financial situation demonstrates abuse of Chapter 7.

For the foregoing reasons, the Panel AFFIRMS the bankruptcy court's order dismissing this case pursuant to 11 U.S.C. § 707(b)(1) and (3).